Antonio **GORSIRA**, Petitioner,

v.

James **LOY**, Acting Secretary, Department of Homeland Security, and Alberto Gonzales, Attorney General of the United States, Respondents.

No. CIV.A. 3:03cv1184(SRU).

United States District Court,
D. Connecticut.

Feb. 16, 2005.

Michael G. Moore, Law Offices of Maria De Castro Foden, Hartford, CT, for Plaintiff.

Douglas P. Morabito, U.S. Attorney's Office, New Haven, CT, for Defendant.

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

UNDERHILL, District Judge.

Antonio Gorsira, currently detained by the Bureau of Immigration and Customs Enforcement ("BICE") pending removal, petitions this court for a writ of habeas corpus.[1] Gorsira principally claims that he has derived United States citizenship and thus is not removable.[2] I conclude that Gorsira has derived citizenship and grant his petition for a writ of habeas corpus.

---

1. The original petition named John Ashcroft, Attorney General of the United States, as the respondent. Following various organizational changes, BICE, a branch of the Department of Homeland Security ("DHS"), is presently charged with the enforcement functions of the former Immigration and Naturalization Service. *See generally* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002); 6 U.S.C. §§ 251(2), 252(a)(3), and 542. Because of the reorganization, there are now two cabinet level officials who may be ultimately responsible for Gorsira during his detention. *Compare* 8 U.S.C. § 1103(a)(1) (the Secretary of DHS is charged with the administration and enforcement of all laws relating to the immigration and naturalization of aliens) *with* 8 U.S.C. § 1226 (Attorney General detains and maintains custody of aliens). Although neither party had moved for substitution, the court ordered *sua sponte* the substitution of James Loy, Acting Secretary of the Department of Homeland Security, as respondent prior to the issuance of this decision. Following that substitution, the court added current Attorney General, Alberto Gonzales, as a respondent.

2. Gorsira also claims that his past criminal convictions for narcotics possession and threatening in the second degree are not bases for removal under the Immigration and Nationality Act, 8 U.S.C. § 1227. There is no need to address those contentions.

## I. Background

Gorsira is a native of Guyana and was born on January 8, 1974. Although a father is named on his birth certificate[3] and Gorsira has stipulated that the man listed is his biological father, Gorsira was born out of wedlock and was thus at birth deemed illegitimate under Guyanese law. Gorsira's biological father never had physical or legal custody of Gorsira nor did he ever provide maintenance or support.

Gorsira entered the United States on an immigrant visa on January 9, 1982, at the age of eight. His mother was naturalized on December 13, 1991, when Gorsira was seventeen years old, in his mother's sole custody, and living in the United States as a lawful permanent resident.

On June 25, 1996, Gorsira pled guilty to a charge of narcotics possession. On February 13, 2002, he pled guilty to a charge of threatening in the second degree. Following those convictions, the former Immigration and Naturalization Service instituted removal proceedings against him.

## II. Removal Proceedings

At his initial hearing before an immigration judge ("IJ") on June 24, 2002, Gorsira was accompanied by an accredited representative. The IJ ruled that Gorsira had not derived citizenship through his mother and thus that he was removable. Gorsira did not appeal the IJ's decision to the Board of Immigration Appeals ("BIA") until seven days after the appeal deadline. He claims that the appeal was not timely filed due to a misunderstanding with his representative. The BIA dismissed the appeal as untimely.

After mistakenly filing a motion to reopen with the BIA, which dismissed the motion for lack of jurisdiction, Gorsira (represented by new counsel) filed a motion to reopen with the IJ on the basis of ineffective assistance of counsel. On April 18, 2003, the IJ denied the motion, finding that Gorsira was not prejudiced by his representative's failure to file a timely appeal because Gorsira had received a full and fair hearing in the immigration court. On September 12, 2003, the BIA affirmed the IJ's decision without opinion.

Because the court file did not contain several documents necessary for a ruling on the merits, on April 21, 2004, I ordered both parties to supplement the record.[4] Both sides submitted briefs. The transcript containing the initial decision of the IJ at the removal hearing was never located.

Late last year, while his petition for a writ of habeas corpus was pending, Gorsira submitted an Application for Certificate of Citizenship by completing a Form N-600. That application is currently pending.

## III. Discussion

### A. Subject Matter Jurisdiction

District courts have subject matter jurisdiction to grant writs of habeas corpus to individuals who are being held in custody in violation of the Constitution or laws of the United States, including immigration laws. 28 U.S.C. § 2241.

3. The parties have submitted what appears to be a copy of the handwritten record of Gorsira's birth in the Register of Births in District No. Eight, Division Georgetown, Guyana. A block on that form is labeled "Signature, Qualification and Residence of Informant." The block contains the following: "Sgd. A. Gorsira (Father) Sgd. C. Singh (mother)," and appears to indicate that both parents had signed the original birth certificate.

4. Neither party had provided: (1) the BIA's decision rejecting Gorsira's appeal, (2) the decision of the IJ at Gorsira's initial removal hearing, and (3) any evidence concerning Gorsira's underlying defenses.

This court does not have jurisdiction to review purely discretionary decisions by an IJ. *Sol v. INS*, 274 F.3d 648, 651 (2d Cir.2001). Legal matters decided by immigration officials, however, have long been within this court's jurisdiction, so that the court can ensure that a detained alien receives due process of law. *See Gegiow v. Uhl*, 239 U.S. 3, 9, 36 S.Ct. 2, 60 L.Ed. 114 (1915). The Second Circuit has recently stated that "Article III courts continue to have habeas jurisdiction under 28 U.S.C. § 2241 over legal challenges to final removal orders." *Calcano–Martinez v. INS*, 232 F.3d 328, 337 (2d Cir.2000).

■ When denying the motion to reopen, the IJ determined that Gorsira's late-filed appellate brief contained no meritorious arguments, thus making a legal determination not a discretionary decision. Legal matters decided by the IJ fall within this court's jurisdiction. The Respondents concede that, because the IJ considered the merits of Gorsira's claims in denying the motion to reopen, the IJ made a legal determination, which this court has jurisdiction to review.

Gorsira's petition requires me to address an additional jurisdictional question. Nationality claims brought in the context of judicial review of orders of removal are governed by 8 U.S.C. § 1252, which provides that nationality claims must be brought initially in the court of appeals:

(b) Requirements for review of orders of removal.

\* \* \* \* \* \*

(5) Treatment of nationality claims.

(A) Court determination if no issue of fact. If the petitioner claims to be a national of the United States and the court of appeals finds from the pleadings and affidavits that no genuine issue of material fact about the petitioner's nationality is presented, the court shall decide the nationality claim.

(B) Transfer if issue of fact. If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of Title 28.

(C) Limitation on determination. The petitioner may have such nationality claim decided only as provided in this paragraph.

8 U.S.C. § 1252(b). The requirements of section 1252(b)(5) raise the question whether nationality claims can be considered by a district court reviewing a petition for a writ of habeas corpus.

The Ninth Circuit has held that section 1252(b)(5) provides the *"exclusive* means of determining U.S. citizenship for aliens in removal proceedings." *Taniguchi v. Schultz*, 303 F.3d 950, 955 (9th Cir.2002) (emphasis added). By contrast, the Fourth Circuit reversed a district court order transferring to the Court of Appeals a habeas petition in which the petitioner asserted a claim of nationality. *Dragenice v. Ridge*, 389 F.3d 92 (4th Cir.2004) (relying on *INS v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and concluding that district court maintained jurisdiction over habeas proceeding involving nationality claim despite section 1252(b)(5)). Moreover, the Ninth Circuit recently limited *Taniguchi* and held that a district court did have jurisdiction to consider a non-frivolous citizenship claim in a habeas proceeding. *Rivera v. Ashcroft*, 394 F.3d 1129 (9th Cir.2005). Finally, the Third Circuit just reversed a district court's denial of a habeas petition, in which

an alien asserted a claim of derivative citizenship. *Bagot v. Ashcroft*, 398 F.3d 252, 267 (3d Cir.2005). Although the court did not discuss the effect of section 1252(b)(5), it noted that the district court had jurisdiction pursuant to section 2241 and remanded the matter to the district court "with directions to issue a writ of habeas corpus." *Id.* at 254, 267.

Although the Second Circuit has not clearly confronted the question, in a decision issued last year, the Second Circuit referenced an order in which it ruled that a district court lacked jurisdiction to consider the petitioner's nationality claim in a habeas proceeding. *Langhorne v. Ashcroft*, 377 F.3d 175, 177 (2d Cir.2004). The *Langhorne* court cured the jurisdictional problems presented there by "deeming the petition transferred" from the district court and "construing it as a petition for review under section 1252(b)(5)(A)."[5] *Id.*

Citing section 1252, several district courts in the Second Circuit have declined to exercise jurisdiction over claims of citizenship in habeas corpus proceedings, instead transferring the claims to the Court of Appeals. *See, e.g., Marquez–Almanzar v. Ashcroft*, 2003 WL 21283418 (S.D.N.Y. June 3, 2003); *Cartagena–Paulino v. Reno*, 2003 WL 21436224 (S.D.N.Y. June 20, 2003). *But see Lee v. Ashcroft*, 2003 WL 21310247 (E.D.N.Y. May 23, 2003) (noting historical distinction between judicial review and habeas corpus and holding that, because section 1252(b)(5) does not expressly repeal habeas corpus jurisdiction, the district court retains habeas jurisdiction over petitioner's nationality claim).[6]

■ Essentially for the reasons explained in *Dragenice*, I believe habeas jurisdiction exists over Gorsira's nationality claim. In *Dragenice*, the Fourth Circuit concluded that neither section 1252(b)(5) nor any other statute divested district courts of habeas jurisdiction involving nationality claims. 389 F.3d at 98–99. The court considered the effect of 8 U.S.C. § 1252(a)(2)(C), which provides that no court has jurisdiction to review final orders of removal against aliens who have been convicted of a qualifying offense. *Id.* at 97. The court concluded that, if Dragenice had filed a petition for review from the final removal order, the court would not have been able to decide his nationality claim because the removal order was grounded on Dragenice's commission of a qualifying offense. *Id.* at 100. "Because section 1252(a)(2)(C) denies judicial review when the alien has committed a qualifying crime, there is no other judicial forum to review his nationality claim, and habeas review must remain available." *Id.* (citations omitted).

As in *Dragenice*, Gorsira's final removal order is based in part on his conviction of a qualifying offense under 8 U.S.C. § 1227(a)(2)(B) (a controlled substance offense). Because under 8 U.S.C. § 1252(a)(2)(C) he appears to be ineligible for judicial review of his final removal order, the habeas proceeding remains the only forum for the determination of his citizenship claim. Accordingly, I conclude that, when a habeas proceeding provides the only means by which a person can obtain judicial review of the merits of a nationality claim, section 1252(b)(5) does not bar consideration of a nationality claim

---

5. In this case, the Respondents have not moved to transfer and have argued that this court "cannot transfer Petitioner's citizenship claim to the Court of Appeals because, even if transferred, the Court of Appeals could not review the claim." Gov't Response to Court's Order (doc. # 18) at 11. The Respondents

base their position on Gorsira's failure to timely appeal the IJ's decision. *Id.* at 12.

6. The decision in *Lee* is currently on appeal to the Second Circuit; oral arguments were held on October 8, 2004.

raised in a habeas petition. Thus, I believe the court possesses jurisdiction over Gorsira's nationality claim in this habeas proceeding, and I will reach the merits of the petition.

## B. Standard of Review

Legal conclusions of the BIA and IJ are reviewed *de novo*. *Secaida–Rosales v. INS,* 331 F.3d 297, 306–07 (2d Cir.2003).

## C. Burden of Proof

 The burden of proof in removal or deportation proceedings is on the government. *Zhang v. Slattery,* 55 F.3d 732, 752 (2d Cir.1995). Once the government has produced proof of foreign birth, however, the burden shifts to the individual to prove his citizenship. *Fabregas v. INS,* 107 Fed.Appx. 249, 250, 2004 WL 1842773, at *1 (2d Cir. Aug.17, 2004) (citing *United States ex rel. Barilla v. Uhl,* 27 F.Supp. 746, 746–47 (S.D.N.Y.1939), *aff'd per curiam,* 108 F.2d 1021 (2d Cir.1940)); [7] *Bernardo v. United States of America,* 2004 WL 741287, at *2 (N.D.Tex. Apr.5, 2004). *See also Bagot,* 398 F.3d at 256–58 (citing *Berenyi v. District Director, INS,* 385 U.S. 630, 637, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967)) (proof of eligibility for citizenship is on the applicant; doubts should be re-

solved in favor of the United States and against the claimant).

## D. Petitioner's Claim of Derivative Citizenship [8]

### 1. 8 U.S.C. § 1432

The parties do not dispute that Gorsira was born in Guyana, and a copy of the record from the Register of Births has been provided to the court. The burden of establishing citizenship, thus, shifts to Gorsira. He asserts United States citizenship by operation of law under INA section 321(a), former 8 U.S.C. § 1432, which was in effect at the time of his mother's naturalization.[9] The relevant subsections provide:

> Section 1432. Child born outside of United States of alien parents; conditions for automatic citizenship.
>
> (a) A child born outside of the United States of alien parents ... becomes a citizen of the United States upon fulfillment of the following conditions:
>
> \* \* \* \* \* \*
>
> (3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and

7. I recognize that the unpublished decision in *Fabregas* is not binding authority and that under the rules of the Second Circuit it may not be cited to any court as precedent 2d Cir. R. § 0.23. Nevertheless, given the lack of precedent in the Second Circuit on this question, *Fabregas* provides helpful guidance.

8. The derivative citizenship claim was not artfully set out in the habeas petition. Gorsira's petition for habeas corpus and stay of removal was a short document, which incorporated an "accompanying memorandum." The accompanying memorandum in turn incorporated an appellate brief that had been prepared during the underlying removal proceedings. Although the petition and memorandum stated that Gorsira was a "citizen of Guyana" without mentioning his claim of de-

rivative citizenship, the brief did present his arguments concerning his United States citizenship. Throughout the proceeding before this court, both parties have based their arguments on the presence of Gorsira's citizenship claim in his petition for habeas corpus. In addition, during a hearing on December 20, 2004, Gorsira's counsel confirmed that he was seeking a declaration of Gorsira's derivative citizenship.

9. Alternatively, Gorsira claims that he has derived citizenship under the Child Citizenship Act, 8 U.S.C. § 1431, which he argues is retroactive. The Second Circuit, however, has held that the Child Citizenship Act does not apply retroactively. *Drakes v. Ashcroft,* 323 F.3d 189, 191 (2d Cir.2003).

the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent ... naturalized under clause .... (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (repealed 2000).

To reiterate, it is undisputed that Gorsira was born out of wedlock; he entered the United States on an immigrant visa at age eight; he was under eighteen, living in the United States as a legal permanent resident, and in his mother's sole custody when she was naturalized. The parties also agree that the man listed on Gorsira's birth certificate is his biological father.

The parties contest, however, whether Gorsira's "paternity has ... been established by legitimation." 8 U.S.C. § 1432(a)(3) (repealed 2000). The Respon-

dents submit that Gorsira is not eligible for derivative citizenship under section 1432 because his father is named in the Register of Birth's record of his birth and that the Guyanese Children Born Out of Wedlock (Removal of Discrimination) Act, No. 12 (1983) ("Removal of Discrimination Act") eliminated all legal distinctions between legitimate and illegitimate children.[10] The Respondents do not suggest any other reason that Gorsira is ineligible for derivative citizenship. Gorsira, however, maintains that the Removal of Discrimination Act merely removed any grounds for discrimination between legitimate and illegitimate children in Guyana and that, because his parents never married, paternity was not established by legitimation.

### 2. Legitimation and the Guyanese Removal of Discrimination Act

■ To determine if an individual qualifies for derivative citizenship under 8 U.S.C. § 1432(a)(3), the court considers whether paternity has been established by legitimation under the laws of the child's native country.[11] See Wedderburn v. INS,

10. Oral arguments on Gorsira's petition for habeas corpus took place on December 20, 2004. At that time, I requested that both parties attempt to locate Guyana's Removal of Discrimination Act. To date, neither party has provided the court with the statute. Thanks to the research efforts of the library of the District Court of Connecticut, I have been able to review the Removal of Discrimination Act; the Infancy Act (Cap.46:01) and the Legitimacy Act (Cap.46:02), which were amended by the Removal of Discrimination Act; and a 1990 memorandum opinion ("Legitimation in Guyana") prepared by a senior legal specialist at the Law Library of Congress. The Guyanese statutes and the Law Library of Congress memorandum are attached as an appendix to this decision. I note that the Removal of Discrimination Act appears to cite 1978 versions of the Infancy and Legitimacy Acts, whereas the versions I reviewed date to 1975 and 1973 respectively. According to the Law Library of Congress, the Infancy Act was

not modified after 1975 and the Legitimacy Act was not modified after 1973, prior to the enactment of the Removal of Discrimination Act.

11. With respect to derivative citizenship claims under section 1432(a)(3), some courts have discussed legitimation under the laws of both a petitioner's native country and the state where he resided. E.g., Barthelemy v. Ashcroft, 329 F.3d 1062, 1067–68 (9th Cir. 2003) (petitioner's concession that father legitimated him was correct under both Haiti and California law); Charles v. Reno, 117 F.Supp.2d 412, 417 (D.N.J.2000) ("It is undisputed that Petitioner was legitimated under Haiti and New Jersey law."). It is possible to imagine circumstances where the laws of the child's native country are not determinative, for example, if both parents have emigrated and legitimation occurred elsewhere. In this case, however, neither party has argued that the laws of Guyana are not determinative,

215 F.3d 795, 797 (7th Cir.2000) (concluding that, under Jamaican law, father's adding his name to birth certificate legitimated child residing in Jamaica). Historically, under the laws of Guyana, legitimation of a child required the marriage of his parents. *See Matter of Gouveia,* 13 I. & N. Dec. 604 (BIA 1970), 1970 WL 18746 (BIA Aug. 7, 1970).

In 1983, the Removal of Discrimination Act repealed Guyana's Bastardy Act and amended four other statutes, including the Infancy Act and the Legitimacy Act. Its apparent purpose was to remove statutory discrimination and to provide children born out of wedlock with the same rights available to children born in wedlock.

The BIA has addressed the Removal of Discrimination Act and its effect on the status of children born out of wedlock. *Matter of Goorahoo,* 20 I. & N. Dec. 782, 783 (BIA 1994), 1994 WL 58716 (BIA Feb. 9, 1994).

In *Goorahoo,* the BIA considered whether a citizen of Guyana, who was a United States legal permanent resident, could petition for a visa for his minor son using the beneficiary preference status available under section 203(a)(2) of the INA, 8 U.S.C. § 1153(a)(2) (1988).[12] Although the child had been born out of wedlock, his birth certificate reflected the petitioner as his father. In addition, an affidavit signed by the child's mother attested that the petitioner had acknowledged paternity of the child and that the petitioner was regularly involved in the child's maintenance and upbringing.

The petition for a visa using beneficiary preference status required the BIA to consider whether the boy qualified as the petitioner's "child" within the meaning of section 101(b)(1) of the INA, which provided the relevant definition:

(1) The term "child" means an unmarried person under twenty-one years of age who is—

(A) a legitimate child;

 * * * * * *

(C) a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

8 U.S.C. § 1101(b)(1) (1988) (amended).

Because the petitioner's son had been born out of wedlock, the BIA considered whether he was an eligible "child" under 8 U.S.C. § 1101(b)(1)(C). The BIA relied on a memorandum from the Law Library of Congress, which discussed legitimation in Guyana, in particular the effect of the Removal of Discrimination Act on the status of children born out of wedlock. That memorandum remarked that although the Act:

does not establish a general rule that children are to be regarded as being of equal status regardless of whether they have been born to married or unmarried parents, it did amend a number of ex-

---

and there is no evidence of legitimation in the United States.

**12.** The record before the BIA included a memorandum opinion from a senior legal specialist at the Law Library of Congress, and the BIA relied on the analysis set forth there. I have located a copy of the memorandum ("Legitimation in Guyana") referenced in

*Goorahoo.* The memorandum is included in the appendix to this opinion. I note that the date mentioned in *Goorahoo* (January 16, 1986) differs from the date listed on the memorandum that I have received (February 1990). According to memorandum's author, however, the memorandum that I received is the same one cited by the BIA in *Goorahoo.*

tant enactments to eliminate references to illegitimacy and to give all children equal rights under them.

Law Library of Congress Memo at 4.

One Guyanese statute amended by the Removal of Discrimination Act and of particular importance to the issue in *Goorahoo* is the Infancy Act, which deals principally with contracts by minors, guardianship, and custody rights. As amended, the Infancy Act provided the following definitions of "infant" and "father":

1A. In this Act—

(a) "infant" means any person who is a minor, whether born in wedlock or out of wedlock;

(b) "father," in relation to an infant who is born out of wedlock, means—

(i) the man who has been adjudged to be the father of the infant by a court of competent jurisdiction; or

(ii) if there is no such man, *the man who has acknowledged the infant to be his child, and has contributed towards the maintenance of the infant,* before he exercises or seeks to exercise in respect of the infant any rights or functions conferred on the father of an infant by any provision of this Act.

Removal of Discrimination Act § 2 (Schedule), *amending* Infancy Act, Cap. 46:01 § 1A (emphasis added).

Significantly, in *Goorahoo*, the child's biological father was before the court, petitioning for beneficiary preference status. He had acknowledged his son as his child and had regularly contributed to his son's maintenance and upbringing. Thus, the petitioner in *Goorahoo* would have qualified as his "father" under Guyana's amended Infancy Act and had custody rights. Without discussing the Infancy Act, the BIA ruled that the petitioner's son quali-

fied as his legitimated child under section 1101(b)(1)(C). 20 I. & N. Dec. at *785.

The Respondents here rely heavily on the fact that, in *Goorahoo*, the BIA modified its decision in *Gouveia* and stated that:

Guyana has eliminated all legal distinctions between legitimate and illegitimate children. Thus, children born out of wedlock in Guyana after May 18, 1983, which is the effective date of the Removal of Discrimination Act, and children who are under the age of 18 prior to that date are deemed legitimate and legitimated children, respectively.

*Id.* This statement was unnecessary to the decision in *Goorahoo* and overly broad.

The Removal of Discrimination Act did eliminate many existing legal distinctions between legitimate and illegitimate children. *See* Law Library of Congress Memo at 4. The Act also replaced the term "illegitimate" with the term "born out of wedlock" in several statutes and amended particular acts in order to remove provisions that discriminated against children born out of wedlock or their parents, for example, with respect to inheritance and custody rights. *See* Removal of Discrimination Act § 2 (Schedule), *amending* Civil Law of Guyana Act, Cap. 6:01 § 5 (intestate succession); *id. amending* Infancy Act, Cap. 46:01 § 10A (custody rights).

The Removal of Discrimination Act did not, however, include any broad provisions eliminating all distinctions between illegitimate and legitimate children (or between children born in wedlock and out of wedlock). The author of the Law Library of Congress memorandum concluded that the Act "does not attempt to generally abolish the legal distinction between legitimate and illegitimate children." Law Library of Congress Memo at 5.[13] In fact, one signifi-

---

**13.** I note that Guyana's 1980 Constitution does include the following provision:

Children born out of wedlock are entitled to the same legal rights and the same legal

cant distinction remained in Guyana's laws after the Removal of Discrimination Act: a child born out of wedlock could only be legitimated through the subsequent marriage of his parents. Legitimacy Act, Cap. 46:02 § 3 (1975), *amended by* Removal of Discrimination Act, § 2 (Schedule). The Legitimacy Act was not amended to provide alternative means of legitimation.[14]

Even if *Goorahoo's* discussion of Guyanese law had been entirely accurate, Respondents' reliance on it would be misplaced. *Goorahoo* did not consider the effect of the Removal of Discrimination Act on claims of derivative citizenship under section 1432. In *Goorahoo,* the BIA considered beneficiary preference status for visas, specifically the definition of "child" under 8 U.S.C. § 1101(b)(1). The Second Circuit has described the statutory context within which visa preferences are made available and noted that the preference system was "primarily designed to further the basic objective of reuniting families...." *Lau v. Kiley,* 563 F.2d 543, 545 (2d Cir.1977) (citing S.R. No. 748, 89th Cong., 1st Sess. 13, reprinted in (1965) U.S.Code Cong. & Admin. News 3328, 3332).

The provision of the derivative citizenship statute at issue here reflects a different goal of Congress: the protection of parental rights. *See Barthelemy v. Ashcroft,* 329 F.3d 1062, 1066 (9th Cir.2003). "If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished." *Id.* (citing *Fierro v. Reno,* 217 F.3d 1, 6 (1st Cir.2000) and *Wedderburn,* 215 F.3d at 800). In effect, section 1432 "prevents the naturalizing parent from usurping the parental rights of the alien parent." *Id.* The exceptions available in sections 1432(a)(2)-(3) reflect Congress' recognition of circumstances in which this general rule precluding derivative citizenship when only one parent naturalizes is overly broad. *Id.* The alien parent's rights are not of concern, if, for example, the alien parent is deceased or if the alien, biological father has not legitimated the child.

In short, in section 1153, Congress sought to further the goal of family reunification; by contrast, in section 1432, Congress aimed to protect the rights of alien parents. In *Goorahoo,* the BIA considered 8 U.S.C. §§ 1153(a)(2) and 1101(b)(1) and held that the son qualified as the petitioner's child for purposes of a beneficiary preference status visa. I am consid

status as are enjoyed by children born in wedlock. All forms of discrimination against children on the basis of their being born out of wedlock are illegal. Constitution of the Co-operative Republic of Guyana Act, 1980, Guy. Laws. ch. 2, ¶ 30, *available at* http://www.georgetown.edu/pdba/Constitutions/Guyana/guyana96.html. As noted in the Law Library of Congress memorandum, Chapter II of the Constitution is captioned "Principles and Bases of the Political, Economic, and Social System" and concludes with a section, stating that Parliament "may provide for any of those principles to be enforceable in any court or tribunal." *Id.* § 39 (amended 1988). Section 39 suggests that the provisions of Chapter II were intended to serve merely as goals "that the National Assembly was obliged to try to help Guyana reach through the enactment of appropriate legislation." Law Library of Congress Memo at 3.

14. The broadest reading of Guyana's Removal of Discrimination Act and the amended Infancy and Legitimacy Acts arguably provides two additional means of establishing paternity through legitimation of a child born out of wedlock. In addition to marrying the child's mother, a man may be able to establish his paternity through legitimation if he has either (a) been adjudged to be the child's father by a court, or has (b) acknowledged the child as his own and has contributed towards the maintenance of the child. Removal of Discrimination Act § 2 (Schedule), *amending* Infancy Act, Cap. 46:01 § 1A.

ering the former 8 U.S.C. § 1432 and whether Gorsira's paternity has been "established by legitimation."

The parties agree that the father's signature on Gorsira's birth certificate, which presumably constituted recognition of paternity, did not constitute *legitimation* at the time of the birth. The Respondents point only to the Removal of Discrimination Act to argue that Gorsira was later legitimated by operation of law. In fact, even after passage of the Removal of Discrimination Act, the Legitimacy Act continued to provide that marriage of the child's parents was the sole means of legitimation under Guyanese law:

2. In this Act—

"date of legitimation" means the date of the marriage leading to the legitimation;

\* \* \* \* \* \*

"legitimated person" means a person legitimated by this Act;

\* \* \* \* \* \*

3. (1) Subject to this section, where the parents of [a person born out of wedlock] marry or have married one another, whether before or after the commencement of this Act, the marriage did or shall, if the father of the [person born out of wedlock] was or is at the date of the marriage domiciled in Guyana, render that person, if he is or was living, legitimate from the date of the marriage.

Legitimacy Act, Cap. 46:02, §§ 2–3 (1975) *amended by* Removal of Discrimination § 2 (Schedule) (amendments reflected in brackets). The Removal of Discrimination Act amended the Legitimacy Act in only

two ways: replacing the term "illegitimate" with the term "born out of wedlock" and expanding intestate succession rights.

For purposes of beneficiary preference status visas, the United States may consider all children born in Guyana either legitimate or legitimated because the Removal of Discrimination Act appears to have granted to children born out of wedlock the same rights of children born in wedlock. *Cf. Lau*, 563 F.2d at 550–51 (distinguishing paternity proceeding from legitimation and holding that for purposes of 8 U.S.C. § 1101(b)(1) all children born in China are "legitimate children" because of legislative grant of legitimacy to all persons). Section 1432, however, requires me to consider whether "paternity has ... been established by legitimation" under the laws of Guyana. The Removal of Discrimination did not legitimate Guyanese children who were born out of wedlock, nor did it provide that a father's acknowledgment of paternity was sufficient to establish paternity, legitimate a child, or affect the father's custodial rights.[15]

My reading of the Guyanese statutes is buttressed by the 1990 Law Library of Congress memorandum, which concluded that "Guyana still has a Legitimacy Act that only provides for the legitimation through the subsequent marriage of a child's natural parents." Law Library of Congress Memo at 4. In addition, the author noted that "[t]here are no provisions in the laws of Guyana for the legitimation of a child through recognition. Therefore, the fact that [a] putative father's name appears on the subject's birth certificate does not affect [the child's] status." *Id.* at 5, n. 5.[16]

---

**15.** At least one member of the BIA has likewise applied section 1432 and concluded that, despite *Goorahoo's* interpretation of the Guyanese Removal of Discrimination Act, the Act does not provide a means of establishing paternity or legitimation through mere acknowledgment. *In re Brian Anthony Johnson,* 2004

WL 880245 (BIA Mar. 9, 2004) (Cole, dissenting).

**16.** One of the memorandum's conclusions, that "a strong case can be made" that Guyana's Removal of Discrimination Act should be interpreted as effectively legitimating all children born to unmarried parents, seems incon-

Furthermore, the memorandum compared Guyana's Removal of Discrimination Act with Status of Children Acts passed in common law jurisdictions in the Caribbean. *Id.* at 3. Those statutes have purported to abolish the legal distinctions between legitimate and illegitimate children for purposes *other than* for determining citizenship and domicile. *Id.* The Removal of Discrimination Act was *less broad* than the Status of Children Acts, which themselves did not abolish distinctions between legitimate and illegitimate children for purposes of citizenship.

In sum, the Removal of Discrimination Act did not equate recognition of paternity with legitimation. Even following its enactment, paternity could be established by legitimation in Guyana only upon the marriage of the child's biological parents.

### 3. *Gorsira's Claim of Citizenship*

The facts in the record are undisputed. Gorsira was born out of wedlock, and his parents never married. He immigrated to the United States at age eight. His mother was naturalized on December 13, 1991, when Gorsira was seventeen years old, in his mother's sole custody, and living in the United States as a lawful permanent resident. With respect to paternity, Gorsira has stipulated that the man who signed his birth certificate is his biological father. Gorsira was never in the custody of his father, however, and his father has never provided maintenance or support. Gorsira's biological father would not have qualified as his "father" under the Infancy Act;

thus, protection of his father's paternity rights would not be a goal of the statutory limits on derivative citizenship.

██ Although it removed legal distinctions between children born out of wedlock and children born to married parents, Guyana's Removal of Discrimination Act did not permit fathers who merely acknowledged paternity to exercise parental rights and it did not equate acknowledgment of paternity with legitimation. In fact, the Removal of Discrimination Act amended Guyana's Legitimacy Act, which continued to provide only one means of legitimation: marriage of the child's parents. Accordingly, despite his father's apparent acknowledgment of paternity, because Gorsira was born out of wedlock and his parents never married, Gorsira's paternity was never established *by legitimation* under the laws of Guyana. Therefore, he derived citizenship under the former 8 U.S.C. § 1432(a) upon the naturalization of his mother.

### IV. Conclusion

Gorsira derived citizenship through the naturalization of his mother when he was seventeen, living in the United States as a permanent resident, and in her sole legal custody. As a citizen, he is not removable, and must be released from custody.[17]

Gorsira's petition for a writ of habeas corpus (doc. # 1) is GRANTED. The Respondents shall release him from custody forthwith. The clerk shall enter judgment and close the file.

It is so ordered.

---

sistent with the memorandum's legal analysis. Law Library of Congress Memo at 5. In any event, even if accurate, that statement has no bearing on whether Gorsira's paternity was established by legitimation under Guyanese law.

**17.** Gorsira's petition reached this court on a claim of ineffective assistance of counsel. The IJ rejected that claim because he con-

cluded that, since Gorsira's appellate brief contained no meritorious arguments, he was not prejudiced by the alleged ineffective assistance of counsel. For the reasons set forth in this decision, I conclude that Gorsira was prejudiced by the late filing of the appeal. Because, as a matter of law, Gorsira is a United States citizen, there is no point in remanding Gorsira's petition to the BIA or IJ for further proceedings.

*APPENDIX*

*126*

# GUYANA

### ACT NO. 12 of 1983

## CHILDREN BORN OUT OF WEDLOCK (REMOVAL OF DISCRIMINATION) ACT 1983

I assent.

L. F. S. BURNHAM,
President.

1983—05—18.

## ARRANGEMENT OF SECTIONS

SECTION
1. Short title.
2. Amendment of certain enactments.
3. Repeal of the Bastardy Act and savings.

### SCHEDULE

Price: $1.72. To be purchased from the Ministry of Information Georgetown, Guyana

Printed by Guyana National Printers Ltd.

AN ACT to amend certain enactments and to repeal the Bastardy Act.

A.D. 1983 Enacted by the Parliament of Guyana: —

Short title. 1. This Act may be cited as the Children Born Out of Wedlock (Removal of Discrimination) Act 1983.

Amendment of certain enactments. 2. The enactments specified in the first column of the Schedule are hereby amended in the manner specified in the corresponding entry in the second column of that Schedule.

Repeal of the Bastardy Act and savings. Cap. 46:03 3. (1) The Bastardy Act (hereafter in this section referred to as the "said Act") is hereby repealed.

 (2) Notwithstanding the repeal of the said Act by subsection (1) —

 (a) any complaint made under section 3 or application made under section 9 of the said Act and pending on the day immediately preceding the commencement of this Act may be continued to its final determination under the provisions of the said Act as if the said Act had not been repealed; and

 (i) the relevant provisions of the said Act shall apply to, and in relation to, the complaint or the application, as the case may be, and all matters arising therefrom as if the said Act had not been repealed; and

 (ii) the provisions of paragraph (b) shall apply to any order made under the said Act in respect of any matter which is the subject of the complaint or the application, as the case may be, or any appointment made under the said Act for any purpose relating to any such matter, including an order under section 4 or 10 or an appointment under section 6 (3) of the said Act, in the same manner as that paragraph would apply to, and in relation to, any such order or appointment if it were in force on the day immediately preceding the commencement of this Act;

 (b) any affiliation order made under section 4 of the said Act in respect of a child, any order made under section

6 (3) of the said Act appointing a person to have the custody of a child or any order made under section 10 of the said Act directing payment of any sum to the poor law commissioners or a district commissioner in respect of a child chargeable to the poor law commissioners or any other order or appointment made under the said Act, and in force on the day immediately preceding the commencement of this Act, shall continue to be in force until it would have ceased to be in force under the provisions of the said Act, and the relevant provisions of the said Act shall apply to, and in relation to, such order and the enforcement thereof or any such appointment and, in the case of an affiliation order or an order under section 10 of the said Act, the amounts payable under the order as if the said Act had not been repealed:

Provided that —

(i) the affiliation order made under section 4 of the said Act in respect of the child shall not, if in respect of the child an order of maintenance is made under the Maintenance Act, be enforced **Cap. 45:34** in respect of the period for which the second mentioned order is enforceable;

(ii) an order made under section 6 (3) of the said Act appointing a person to have the custody of a child shall, if an order is made under section 15 of the Infancy Act regarding the custody **Cap. 46:11** of the child, cease to be in force with effect from the day immediately preceding the date on which the second mentioned order is made.

Section 2 **SCHEDULE**

| Enactments | Amendments |
|---|---|
| Evidence Act, Cap. 5:03<br><br>Section 61 (2) | (1) Substitute "child born out of wedlock" for "bastard child" where they occur for the first time.<br><br>(2) Substitute "child" for "bastard child" where they occur for the second time. |

**4**

129

| Enactments | Amendments |
|---|---|
| **Civil Law of Guyana Act, Cap. 6:01**<br><br>Section 5 | Insert after subsection (6) the following subsection as subsection (7) —<br><br>"(7) In determining relationships for the purposes of this section no regard shall be had to whether any person is born in wedlock or out of wedlock and a person born out of wedlock shall be entitled to the same rights under this section as a person born in wedlock.<br><br>Provided that a man shall not, as the father of a child born out of wedlock and dying intestate, be entitled to take any interest under this section in the estate of the child unless, before the death of the child, —<br><br>(i) he had been adjudged to be the father of the child by a court of competent jurisdiction; or<br><br>(ii) he had acknowledged the child to be his own and had contributed towards the maintenance of the child.". |
| **Maintenance Act, Cap. 45:03**<br><br>Section 2 | (1) In paragraph (a) after "children" insert ",whether born in wedlock or not".<br><br>(2) In paragraph (c) after "child" insert ", whether born in wedlock or not,".<br><br>(3) For paragraph (d) substitute the following —<br><br>"(d) the children, whether born in wedlock or not, —<br>(i) of any child that his wife has by him during his marriage to her;<br>(ii) of any child of which he has been duly adjudged to be the father under any law for the time being in force; or<br>(iii) of any child which is acknowledged by him to be his own,<br><br>in the event of the parents of those children failing to maintain them, until they attain the age of sixteen years, or longer if they are, by reason of bodily or mental infirmity, unable to maintain themselves.". |
| Section 4 | (1) Insert "or her" after "with whom his". |

| Enactments | Amendments |
|---|---|
| | (2) Insert "or her" after "treated him". |
| | (3) Insert after "her infancy," — |
| | "and also the man who is his or her father, whether or not his or her mother openly cohabited with that man at the time of his or her birth, provided that during his or her infancy that man had acknowledged him or her as the man's child and had contributed towards his or her maintenance,". |
| Section 6, Proviso | Substitute "twenty" for "ten" in both the places where it occurs. |
| Section 13 | Substitute "twenty" for "ten" in both the places where it occurs. |
| **Infancy Act, Cap. 46:01** Section 1A | Insert after section 1 the following section as section 1A — |
| | **Interpretation.** 1A. In this Act — |
| | (a) "infant" means any person who is a minor, whether born in wedlock or out of wedlock; |
| | (b) "father", in relation to an infant who is born out of wedlock, means — |
| | (i) the man who has been adjudged to be the father of the infant by a court of competent jurisdiction; or |
| | (ii) if there is no such man, the man who has acknowledged the infant to be his child, and has contributed towards the maintenance of the infant, before he exercises or seeks to exercise in respect of the infant any rights or functions conferred on the father of an infant by any provision of this Act. |
| | and the expression "parent", in so far as it refers to the father of such infant, shall be construed accordingly.'. |
| Section 2 | Delete "(by which term minors are held to be meant and included)". |

| Enactments | Amendments |
|---|---|
| Section 7 | (1) Insert "or she" after "if he". |
| | (2) Delete "if a male and if she has attained the full age of twelve years if a female". |
| Section 10A | Insert after section 10 the following section as section 10A — |
| | "Guardian-ship of Infant. 10A. (1) Both the father and the mother of an infant shall be the guardians, and shall be entitled to the custody, of the infant. |
| | (2) The father or mother of an infant, or both of them, may be deprived by the Court of the guardianship or custody of the infant or both under the provisions of this Act-". |
| Section 12 | Substitute the following — |
| | "On death of one of the parents the other parent to be guardian of the infant alone or jointly with others. 12. (1) Subject to subsection (2), on the death of one of the parents of an infant, the surviving parent shall continue to be the guardian of the infant, — |
| | (a) where any guardian has been appointed by the parent who died, jointly with that guardian; or |
| | (b) where no guardian has been appointed by the parent who died, alone. |
| | (2) Where one of the parents of an infant has died, and — |
| | (a) no person has been appointed by him to be the guardian of the infant: or |
| | (b) if the person or all the persons appointed by him to be the guardian or guardians of the infant is or are dead, or refuses or refuse to act, |
| | the Court, if it thinks fit, may appoint any person or persons to be the guardian or guardians of the infant to act jointly with the surviving parent". |

| Enactments | Amendments |
|---|---|
| Section 13 | (1) Substitute for the marginal note the following — |
| | "Parent's power of appointment of guardian in certain cases.". |
| | (2) Substitute for subsection (1) the following subsections — |
| | "(1) Any one of the parents of an infant may by will, deed, or document notarially executed appoint any fit person or persons to be guardian or guardians of the infant, after the death of that parent, jointly with the surviving parent. |
| | (1A) Both parents, acting jointly or separately, or any one of the parents, of an infant may by will, deed, or document notarially executed appoint any fit person or persons to be guardian or guardians of the infant after the death of both parents. |
| | (1B) Where there are more than one person appointed under subsection (1A) to be guardians of an infant, the guardians so appointed shall act jointly.". |
| Section 14 | Delete. |
| Section 15 | Substitute the following — |
| | "Court may make order as to custody. 15. Where the parents are living apart the Court may, upon the application of a parent with whom the infant is not residing, make any order it thinks fit regarding the custody of the infant and the right of access to the infant of either parent, having regard to the welfare of the infant and the conduct of the parents, and to the wishes as well of the father as of the mother, and may alter, vary or discharge the order on the application of either parent or, after the death of either parent, any guardian under this Act, and in every case may make any order respecting the costs of either parent and the liability of the other parent therefor, or otherwise as to costs, it thinks just.". |
| Section 19 | Delete. |
| Section 20 | Substitute "the custody or control of the infant shall be left exclusively to one parent" for "the father of the infant shall give up the custody or control of the infant to the mother". |

| Enactments | Amendments |
|---|---|
| **Legitimacy Act, Cap. 46:02**<br><br>General amendment | Substitute "person born out of wedlock" for "illegitimate person" wherever they occur. |
| Section 11 | (1) In subsection (1) — |

(a) insert "and before the commencement of the Children Born Out of Wedlock (Removal of Discrimination) Act 1983" after "this Act";

(b) substitute "a child born out of wedlock" for "an illegitimate child";

(c) substitute "the child born out of wedlock" for "the illegitimate child".

(2) In subsection (2) —

(a) insert "and before the commencement of the Children Born Out of Wedlock (Removal of Discrimination) Act 1983" after "this Act";

(b) substitute "a child born out of wedlock" for "an illegitimate child";

(c) substitute "children, whether born in wedlock or out of wedlock," for "legitimate and illegitimate children".

*Passed by the National Assembly on 1983—05—13.*

**F. A. Narain,**
Clerk of the National Assembly.

(Bill No. 12/1983)

# THE LAWS
# OF
# GUYANA

### REVISED EDITION

Prepared under the Authority of

THE LAW REVISION ACT (Cap. 2:02)

BY

THE HON. SHRIDATH SURENDRANATH RAMPHAL, S.C.,
*Attorney-General*

BRYNMOR THORNTON INNISS POLLARD, S.C.,
*Chief Parliamentary Counsel*

FRANCIS OTHO COLERIDGE HARRIS, S.C.,
*United Nations Legal Adviser (Law-Revision)*

Law Revision Commissioners

Published by the Government of Guyana
1973

LAWS OF GUYANA

# INFANCY ACT
## CHAPTER 46:01

Act
19 of 1916
Amended by
28 of 1923
O. 4/1974

## Current Authorised Pages

| Pages (inclusive) | | Authorised by L.R.O. |
|---|---|---|
| 1–6 | ... | 1/1975 |
| 7–8 | ... | 1/1973 |

LAWS OF GUYANA

Note

on

Subsidiary Legislation

This Chapter contains no subsidiary legislation.

Note
on
Revision Date
This Act has been revised up to 30th June, 1974—instead of 1st January, 1974.

476

## CHAPTER 46:01

## INFANCY ACT

### ARRANGEMENTS OF SECTIONS

SECTION
1. Short title.
2. Contracts by infants, except for necessaries, to be void.
3. No action to be brought on ratification of infant's contract.
4. Soliciting infant to make affidavit in connection with loan.
5. Avoiding contract for payment of loan advanced during infancy.
6. Infant executors and administrators.
7. Wills of infants.
8. Marriage settlements with the sanction of the Court.
9. Marriage to render infant of full age.
10. Parent under 18 may appoint guardian.
11. (1) Guardian's custody and management of infant's property during infancy.
 (2) Application of income of property of infants for purposes of education or otherwise.
12. On death of father, mother to be guardian alone or jointly with others.
13. Mother may appoint guardian in certain cases.
14. Illegitimate children.
15. Court may make orders as to custody.
16. Removal of guardian.
17. Guardianship in case of divorce or judicial separation.
18. Application to Court.
19. Court may order that mother may have access to, and custody of, infant under sixteen years.
20. In case of separation deed between father and mother.
21. Court to retain upper guardianship.

1929 Ed.
c. 141
1953 Ed.
c. 39

An Act to introduce special provisions relating to the Contracts, Wills 19 of 1916 and Guardianship of Infants.

[28TH OCTOBER, 1916]

**1.** This Act may be cited as the Infancy Act. Short title.

**2.** All contracts henceforth entered into by infants (by which term minors are held to be meant and included) for the repayment of money lent or to be lent, or for goods supplied or to be supplied (other than contracts for necessaries), and all accounts stated with infants, shall be absolutely void: Contracts by infants, except for necessaries, to be void.

Provided that this enactment shall not invalidate any contract into which an infant, by any existing or future statute or by the rules of common law or equity, may enter except those now voidable by law.

No action to be brought on ratification of infant's contract.

**3.** No action shall be brought whereby to charge anyone upon any promise made after full age to pay a debt contracted during infancy, or upon any ratification made after full age of a promise or contract made during infancy, whether there is or is not any new consideration for that promise or ratification after full age.

Soliciting infant to make affidavit in connection with loan.

**4.** If anyone, except under the authority of the High Court (hereinafter referred to as the Court) solicits an infant to make an affidavit or statutory declaration for the purpose of or in connection with any loan, he shall be liable on summary conviction to a fine of three hundred dollars and to imprisonment for one month, and if convicted on indictment to a fine of fifteen hundred dollars or to imprisonment for three months.

Avoiding contract for payment of loan advanced during infancy.

**5.** (1) If an infant who has contracted a loan which is void in law agrees after he comes of age to pay any money which in whole or in part represents, or is agreed to be paid in respect of, that loan and is not a new advance, that agreement and any instrument, negotiable or other, given in pursuance thereof or for carrying it into effect, or otherwise in relation to the payment of money representing or in respect of the loan, so far as it relates to money which represents or is payable in respect of the loan and is not a new advance, shall be void absolutely as against all persons whomsoever.

(2) For the purposes of this section any interest, commission, or other payment, in respect of the loan shall be deemed to be a part of the loan.

Infant executors and administrators.

[O. 4/1974]
c. 12:01

**6.** (1) An infant may be appointed executor but cannot exercise the office until he has attained the full age of eighteen years.

(2) Letters of administration under the Deceased Persons Estates Administration Act shall not be granted to anyone before he has reached the age of eighteen years, but if an infant is named as sole executor by a will, letters of administration *durante minore aetate* may be granted to his guardian or to any other person the Registrar of Deeds or the Court deems fit.

Wills of infants.

**7.** An infant can make a will without the consent of parent or guardian if he has attained the full age of fourteen years if a male and if she has attained the full age of twelve years if a female, but subject as aforesaid an infant cannot make a will.

**8.** (1) An infant above the age of seventeen years may, with the sanction of the Court, upon or in contemplation of marriage make a valid and binding settlement or contract for a settlement of all or any property movable or immovable, real or personal, whether in possession, reversion, remainder, or expectancy, to or over which he or she is entitled or has any power of appointment, not being a power expressly declared to be incapable of being exercised during infancy; and all transports or conveyances, mortgages, appointments of property, and contracts to make a conveyance, or transport, mortgage, or appointment, executed by the infant with the approbation of the Court in order to give effect to the settlement shall be as valid as if the infant were of full age.

*Marriage settlements with the sanction of the Court.*

(2) The Court may sanction the settlement or contract upon petition, presented by the infant or his or her guardian, in a summary way without the institution of a suit, and, if there is no guardian, may or may not require a guardian to be appointed, and also may if it thinks fit require any persons interested or appearing to be interested to be served with notice of the petition.

**9.** An infant whether male or female shall be deemed by the mere fact of marriage to have attained full age, but the Court by order, made upon petition by the infant or his or her guardian, or by the Public Trustee, in a summary way without the institution of a suit, may give any directions it sees fit for the protection of the property of the parties until they have attained the age of eighteen.

*Marriage to render infant of full age. [O. 4/1974]*

**10.** Subject to the other provisions of this Act, a parent under eighteen years whether male or female may, by will, deed, or document notarially executed, appoint as from the date of his or her death a guardian or guardians to any child or children who is or are unmarried at the date of his or her death.

*Parent under 18 may appoint guardian. [O. 4/1974]*

**11.** (1) Any guardian or guardians may assume the custody to the use of any infant of the profits of all his immovable property, and also the custody, tuition, and management of his movable property, until he reaches the age of eighteen years or until his marriage, and bring any action or actions in relation thereto and may take or grant leases on his behalf.

*Guardian's custody and management of infant's property during infancy. [O. 4/1974]*

(2) Where any property is held by a guardian, trustee, administrator, or executor, in trust for an infant (whether the trust is express, implied, or constructive), either for life or for any greater interest, and whether absolutely or contingently on the infant attaining the age of eighteen years, or on the occurrence of any event before the infant's attaining that age, the guardian, trustee,

*Application of income of property of infants for purposes of education or otherwise. [O. 4/1974]*

478

administrator, or executor, may at his sole discretion pay to the infant's parent or guardian (if any) or otherwise apply for or towards the infant's maintenance, education, or benefit, the income of that property or any part thereof, whether there is or is not any other fund applicable to the same purpose, or anyone bound by law to provide for the infant's maintenance or education.

(3) The guardian, trustee, administrator or executor aforesaid shall accumulate all the residue of that income in the way of compound interest by investing it and the resulting income thereof from time to time on securities on which he is by the settlement (if any) or by law authorised to invest trust money, and shall hold those accumulations for the benefit of the person who ultimately becomes entitled to the property from which they arise; but so that the guardian, trustee, administrator, or executor may at any time, if he thinks fit, apply those accumulations or any part thereof, as if they were income arising in the then current year.

(4) This section applies—

(*a*) only if and as far as a contrary intention is not expressed in the instrument (if any), under which the interest of the infant arises, and shall have effect subject to the terms of that instrument and to the provisions therein contained; and

(*b*) whether the guardian, trustee, administrator, or executor acquired that capacity before or after the commencement of this Act.

On death of father, mother to be guardian alone or jointly with others.
12. (1) On the death of the father of an infant, and if he has died prior to the commencement of this Act then from and after the commencement, the mother, if surviving, shall be the guardian of the infant, either alone when no guardian has been appointed by the father, or jointly with any guardian appointed by him.

(2) When no guardian has been appointed by the father, or if the guardian or guardians appointed by him is or are dead, or refuses or refuse to act, the Court, if it thinks fit, may from time to time appoint a guardian or guardians to act jointly with the mother.

Mother may appoint guardian in certain cases.
13. (1) The mother of an infant may by will, deed, or document notarially executed—

(*a*) appoint any person or persons to be guardian or guardians of the infant after the death of herself and the father of the infant (if the infant is then unmarried), the guardians when appointed by both parents acting jointly;

(*b*) provisionally nominate some fit person or persons to act as guardian or guardians of the infant after her death jointly with the father of the infant, and the Court, after her death, if it be shown to its satisfaction that the father is for any reason unfitted to be the sole guardian of his children, may

confirm the appointment of the guardian or guardians, who shall thereupon be authorised and empowered so to act as aforesaid, or may make any other order in respect of the guardianship the Court thinks right.

(2) If guardians are unable to agree upon a question affecting the welfare of an infant, any of them may apply to the Court for its direction, and the Court may make any order or orders regarding the matters in difference it thinks proper.

**14.** The mother of an illegitimate infant shall be the guardian of that infant and shall be entitled to its custody but may be deprived by the Court of the guardianship or custody as in section 16 provided. *Illegitimate children.*

**15.** The Court, upon the application of the mother of an infant, may make any order it thinks fit regarding the custody of the infant and the right of access to the infant of either parent, having regard to the welfare of the infant and the conduct of the parents, and to the wishes as well of the mother as of the father, and may alter, vary, or discharge the order on the application of either parent or, after the death of either parent, any guardian under this Act, and in every case may make any order respecting the costs of the mother and the liability of the father therefor, or otherwise as to costs, it thinks just. *Court may make orders as to custody.*

**16.** The Court, on being satisfied that it is for the welfare of the infant, may remove from his office any testamentary guardian or any guardian appointed or acting by virtue of this Act, and the Court, if it deems it to be for the welfare of the infant, may also appoint another guardian in place of the guardian so removed. *Removal of guardian.*

**17.** Wherever a decree for judicial separation, or a decree either *nisi* or absolute for divorce, is pronounced, the Court pronouncing the decree may thereby declare the parent by reason of whose misconduct the decree is made to be a person unfit to have the custody of the children (if any) of the marriage; and in that case the parent so declared to be unfit, upon the death of the other parent, shall not be entitled as of right to the custody or guardianship of the children. *Guardianship in case of divorce or judicial separation.*

**18.** Applications under this Act may be made to the Court in the manner prescribed by rules of court. *Application to Court.*

**19.** The Court upon hearing the petition of the mother of any infant under sixteen years of age, may order that the petitioner shall have access to the infant at the times and subject to the regulations the Court deems proper, or to order that the infant shall be delivered to the mother and remain in or under her custody or control, or if already in her custody or under her control remain therein, until *Court may order that mother may have access to, and custody of infant under 16 years.*

*L.R.O. 1/1973*

the infant attains the age, not exceeding sixteen, directed by the Court; and further, may order that the custody or control shall be subject to any regulations regarding access by the father or guardian of the infant and otherwise the Court deems proper.

In case of
separation
deed between
father and
mother.

20. No agreement contained in any separation deed made between the father and mother of any infant shall be held to be invalid by reason only of its providing that the father of the infant shall give up the custody or control of the infant to the mother:

Provided that the Court shall not enforce that agreement if the Court is of opinion that it will not be for the infant's benefit to give effect thereto.

Court to
retain upper
guardianship.

21. The Court may exercise in the matter of an infant any power which the Supreme Court of British Guiana has hitherto exercised as upper guardian of minors under the Roman-Dutch law practice or procedure, and may further exercise any power now or at any time hereafter exercised in those matters by the Chancery Division of the High Court of Justice in England in accordance with any practice or procedure of that Court.

# LEGITIMACY ACT
## CHAPTER 46:02

Act
14 of 1932

**Current Authorised Pages**

| Pages (inclusive) | | Authorised by L.R.O. |
|---|---|---|
| 1–11 | ... | 1/1973 |

### Index

### of

### Subsidiary Legislation

| | Page |
|---|---|
| Re-registration of Births (Legitimated Persons) Regulations ... ... ... | 8 |
| (Reg. 3/9/1934, 20/1950) | |

## CHAPTER 46:02

## LEGITIMACY ACT

### ARRANGEMENT OF SECTIONS

SECTION
1. Short title.
2. Interpretation.
3. Legitimation by subsequent marriage of parents.
4. Declarations of legitimacy of legitimated persons.
5. Rights of legitimated persons, etc., to take interests in property.
6. Succession on intestacy of legitimated persons and their issue.
7. Application to illegitimate person dying before marriage of parents.
8. Personal rights and obligations of legitimated persons.
9. Estate duty.
10. Provisions as to persons legitimated by extraneous law.
11. Right of illegitimate child and mother of illegitimate child to succeed on intestacy of the other.
12. Savings.

SCHEDULE—Registration of Births of Legitimated Persons.

---

1953 Ed.
c. 165

**An Act to amend the Law relating to children born out of wedlock.** 14 of 1932

[14TH MAY, 1932]

1. This Act may be cited as the Legitimacy Act. Short title.

2. In this Act— Interpretation.

"date of legitimation" means the date of the marriage leading to the legitimation;

"disposition" means an assurance of any interest in property by any instrument whether *inter vivos* or by will;

"intestate" includes a person who leaves a will but dies intestate as to some beneficial interest in his estate;

"legitimated person" means a person legitimated by this Act;

"will" includes codicil.

3. (1) Subject to this section, where the parents of an illegitimate person marry or have married one another, whether before or after the commencement of this Act, the marriage did or shall, if Legitimation by subsequent marriage of parents.

the father of the illegitimate person was or is at the date of the marriage domiciled in Guyana, render that person, if he is or was living, legitimate from the date of the marriage.

(2) The legitimation of a person under this Act does not enable him or his spouse, children or remoter issue to take any interest in property save as is hereinafter in this Act expressly provided.

Schedule.

(3) The provisions contained in the Schedule shall have effect with respect to the re-registration of the births of legitimated persons.

Declarations of legitimacy of legitimated persons.
c. 45:02.

**4.** A person claiming that he or his parent or any remoter ancestor became or has become a legitimated person may, whether domiciled in Guyana or elsewhere and whether a natural-born Commonwealth citizen or not, present a petition under Part II of the Matrimonial Causes Act, and that Part, subject to such necessary modifications as may be prescribed by rules of court, shall apply accordingly.

Rights of legitimated persons, etc., to take interests in property.

**5.** Subject to this Act, a legitimated person and his spouse, children or more remote issue shall be entitled to take any interest in the estate of an intestate or under any disposition in like manner as if the legitimated person had been born legitimate.

Succession on intestacy of legitimated persons and their issue.

**6.** Where a legitimated person or a child or remoter issue of a legitimated person dies intestate in respect of all or any of his property, the same persons shall be entitled to take the same interests therein as they would have been entitled to take if the legitimated person had been born legitimate.

Application to illegitimate person dying before marriage of parents.

**7.** Where an illegitimate person dies after the commencement of this Act and before the marriage of his parents leaving any spouse, children or remoter issue living at the date of such marriage, then, if that person would, if living at the time of the marriage of his parents, have become a legitimated person, the provisions of this Act with respect to the taking of interests in property by, or in succession to, the spouse, children and remoter issue of a legitimated person (including those relating to the rate of estate duty) shall apply as if such person as aforesaid had been a legitimated person and the date of the marriage of his parents had been the date of legitimation.

Personal rights and obligations of legitimated persons.

**8.** A legitimated person shall have the same rights, and shall be under the same obligations in respect of the maintenance and support of himself or of any other person as if he had been born legitimate, and, subject to this Act, the provisions of any Act relating

to claims for damages, compensation, allowance, benefit, or otherwise by or in respect of a legitimate child shall apply in like manner in the case of a legitimated person.

**9.** Where a legitimated person or any relative of a legitimated person takes any interest in property, any estate duty which becomes leviable after the date of legitimation shall be payable at the same rate as if the legitimated persons had been born legitimate.

<div style="float:right">Estate duty.</div>

**10.** (1) Where the parents of an illegitimate person marry or have married one another, whether before or after the commencement of this Act, and the father of the illegitimate person was or is, at the time of the marriage, domiciled in a country, other than Guyana, by the law of which the illegitimate person became legitimated by virtue of such subsequent marriage, that person, if living, shall in Guyana be recognised as having been so legitimated from the commencement of this Act or from the date of the marriage whichever last happens, notwithstanding that his father was not at the time of the birth of such person domiciled in a country in which legitimation by subsequent marriage was permitted by law.

<div style="float:right">Provisions as to persons legitimated by extraneous law.</div>

(2) All the provisions of this Act relating to legitimated persons and to the taking of interests in property by or in succession to a legitimated person and the spouse, children and remoter issue of a legitimated person (including those relating to the rate of estate duty) shall apply in the case of a person recognised as having been legitimated under this section, or who would, had he survived the marriage of his parents, have been so recognised; and accordingly, this Act shall have effect as if references therein to a legitimated person, included a person so recognised as having been legitimated.

(3) For the purposes of this section, the expression "country" includes any Commonwealth country as well as a foreign country.

**11.** (1) Where, after the commencement of this Act, the mother of an illegitimate child, such child not being a legitimated person, dies intestate as respects all or any of her property, the illegitimate child, or, if he is dead, his issue, shall be entitled to take any interest therein to which he or such issue would have been entitled if he had been born legitimate.

<div style="float:right">Right of illegitimate child and mother of illegitimate child to succeed on intestacy of the other.</div>

(2) Where, after the commencement of this Act, an illegitimate child, not being a legitimated person, dies intestate in respect of all or any of his property, his mother if surviving shall be entitled to take any interest therein to which she would have been entitled if the child had been born legitimate and she had been the only surviving parent and if his mother does not survive him then such legitimate

LAWS OF GUYANA

6 **Cap. 46:02** *Legitimacy*

and illegitimate children of his mother as survive him and the persons entitled to succeed them on intestacy shall be entitled to take any interest therein to which they would have been entitled if all such children and the child had been born legitimate.

Savings.

12. Nothing in this Act shall affect the operation or construction of any disposition coming into operation before the commencement of this Act, or affect any rights under the intestacy of a person dying before the commencement of this Act.

s. 3(3)

## SCHEDULE

### REGISTRATION OF BIRTHS OF LEGITIMATED PERSONS

Construction.
c. 44:01.

1. This Schedule shall be construed with the Registration of Births and Deaths Act.

Conditions of re-registration.
c. 44:01.

2. The Registrar General may, on production of such evidence as appears to him to be satisfactory, authorise at any time the re-registration of the birth of a legitimated person whose birth is already registered under the Registration of Births and Deaths Act, and such re-registration shall be effected in such manner and at such place as the Registrar General, with the approval of the Minister, may by regulations prescribe:

Provided that the Registrar General shall not authorise the re-registration of the birth of any such person in any case where information with a view to obtaining such re-registration is not furnished to him by both parents, unless—

(a) the name of a person acknowledging himself to be the father of the legitimated person has been entered in the register in pursuance of section 31 of the Registration of Births and Deaths Act; or

(b) the paternity of the legitimated person has been established by an affiliation order or otherwise by a decree of a court of competent jurisdiction; or

c. 45:02.

(c) a declaration of the legitimacy of the legitimated person has been made under Part II of the Matrimonial Causes Act, as amended by this Act.

Parents to furnish information.

3. It shall be the duty of the parents of a legitimated person, or, in cases where re-registration can be effected on information furnished by one parent and one of the parents is dead, of the surviving parent, within the time hereinafter specified, to furnish to the Registrar General information with a view to obtaining the re-registration of the birth of that person, that is to say—

(a) if the marriage took place before the commencement of this Act, within six months of such commencement;

(*b*) if the marriage takes place after the commencement of this Act, within three months after the date of the marriage.

4. Where the parents, or either of them, fail to furnish the necessary information within the time limited for the purpose, the Registrar General may at any time after the expiration of that time require the parents of a person whom he believes to have been legitimated by virtue of this Act, or either of them, to give him such information concerning the matter as he may consider necessary, verified in such manner as he may direct, and for that purpose to attend personally either at a Registrar's Office or at any other place appointed by him within such time, not being less than seven days after the receipt of the notice, as may be specified in the notice.

Compelling attendance of parents.

5. The failure of the parents or either of them to furnish information as required by this Schedule in respect of any legitimated person shall not affect the legitimation of that person.

Default of parents not to affect legitimation.

LAWS OF GUYANA

## SUBSIDIARY LEGISLATION

---

Reg.
3/9/1934
20/1950

### RE-REGISTRATION OF BIRTHS
### (LEGITIMATED PERSONS)
### REGULATIONS

*made under paragraph 2 of the Schedule to the Act*

Citation.
and
construction.
c. 44:01.
Sub. Leg.

**1.** These Regulations may be cited as the Re-registration of Births (Legitimated Persons) Regulations, and shall be construed with the Registration of Births and Deaths Regulations hereinafter referred to as the Principal Regulations.

Meaning of
"informant."

**2.** In these Regulations, "informant" means a parent of a legitimated person whose duty it is to give information with a view to the re-registration of the birth of such person.

Information
to be for-
warded by
informant.

**3.** Before the Registrar General authorises the re-registration of the birth of a legitimated person, the informant shall forward to him—

(*a*) a certified copy from the register of the entry of the birth of the leigtimated person;

(*b*) a certified copy from the original marriage register or from the duplicate original marriage register of the entry of the marriage of the parents; and

(*c*) a statutory declaration that the copy from the register of births at (*a*) relates to the person of the contracting parties in the copy from the marriage register at (*b*).

Attendance
of informant
before Regis-
trar.

**4.** Where re-registration is authorised by the Registrar General, the informant, or, if there are two informants, such one of them as the Registrar General may direct, shall, subject as hereinafter provided, attend personally at the office of the registrar of births and deaths of the division in which the informant resides within such time as the Registrar General may specify.

Manner and
form of re-
registration.

**5.** (1) (*a*) The registrar of the division in which the informant resides, on receiving the Registrar General's written authority to

re-register the birth of a legitimated person, shall, in the presence of the informant, enter the birth in the birth register in the manner and form set out in these Regulations, and the informant shall sign the register in column 7 of the entry in the presence of the registrar.

(*b*) The registrar shall enter in columns 1 to 6 (inclusive) the particulars stated in the written authority as particulars to be entered in those columns on the information given to the Registrar General.

(*c*) The registrar shall append to the signature of the informant in column 7 the description and address of such informant as required by the written authority to be entered in that column.

(*d*) The registrar shall enter in column 8 the date on which the entry is made in the manner and form provided in regulation 71 of the Principal Regulations in respect of an entry of the date of registration, followed by the words "On the authority of the Registrar General".

(*e*) The registrar shall sign his name in column 9 adding the word "Registrar" after his signature.

(2) Where re-registration is authorised by the Registrar General and no informant is living, then, if the legitimated person is an infant, his guardian may attend personally at the office of the registrar and sign the register in column 7 of the entry; and if the legitimated person is not an infant the registrar shall, if so directed in the written authority of the Registrar General, enter in column 7 the words "On the authority of the Registrar General," and omit such words from column 8. <span>Re-registration where no informant is living.</span>

(3) In this regulation the columns referred to are the columns in Form 1 in the First Schedule to the Registration of Births and Deaths Act. <span>c. 44:01.</span>

**6.** (1) An informant who has removed before re-registration from the division in which the birth took place to some place out of Guyana may, with the consent of the Registrar General, instead of attending at the office of the registrar to sign the register, make and sign a declaration in writing of the particulars to be entered in the register on the information of such informant. <span>Re-registration in case of removal out of Guyana. [Reg. 20/1950]</span>

(2) In the case of an informant who is in any Commonwealth country, the declaration shall be made before a judge, court, notary public or person lawfully authorised to administer oaths in such country, and in the case of an informant who is in any foreign parts out of the Commonwealth, the declaration shall be made before a consular officer of Guyana.

10 **Cap. 46:02** *Legitimacy*

(3) The declaration shall be in such form and shall contain such particulars as the Registrar General may require, being particulars to be entered in the register on the information of such informant.

(4) Upon receipt of the declaration duly attested, the Registrar General may send it, together with his written authority for re-registration to the registrar of the division in which the birth took place.

(5) The registrar of the division in which the birth took place on receiving the Registrar General's written authority for re-registration together with a declaration made and signed in pursuance of this regulation, shall enter the birth in the register in the manner hereinbefore provided, notwithstanding that no informant is present, and in column 7 he shall write the name of the informant as signed in the declaration, followed by the description and address of the informant as stated in the written authority, and append the words "as per declaration dated............................................................................................" and the date on which the declaration was made and signed.

Copies of entries and authorities to be sent to Registrar General.

7. The registrar on making the entry in the register shall forthwith make and deliver to the Registrar General a certified copy of such entry; and shall, on delivering to the superintendent registrar a certified copy of entries of births registered by him during the preceding three months for transmission to the Registrar General, deliver with such certified copy to the superintendent registrar, all written authorities received from the Registrar General with reference to any re-registered entries contained in such certified copy; and the superintendent registrar shall deliver such authorities to the Registrar General.

Reference to re-registration to be made in previous entry.

8. (1) The Registrar General having the custody of the register in which the birth was previously entered shall, or the registrar having the custody of such register shall, when so directed by the Registrar General, cause the previous entry of the birth to be marked in the margin with the words "Re-registered under the Legitimacy Act in the Division of District on and the registrar when he has the custody of such register shall forthwith make a certified copy of such previous entry, including a copy of the marginal note, and deliver such copy to the Registrar General.

c. 44:01.

(2) The mariginal note shall be deemed to be part of the entry and a certified copy of the entry given under the Registration of Births and Deaths Act shall include the marginal note.

**9.** Where application is made for a certified copy of the entry of the birth of a person whose birth has been re-registered, the Registrar General or the registrar, as the case may be, shall supply a certified copy of the entry of re-registration; and no certified copy of the previous entry shall be given except under the direction of the Registrar General.

*Certified copies of entries of re-registration.*

**THE LIBRARY OF CONGRESS**
101 INDEPENDENCE AVENUE, S.E.
WASHINGTON, D.C. 20540-3230

LAW LIBRARY
DIRECTORATE OF LEGAL RESEARCH
WESTERN LAW DIVISION

(202) 707-5077
(202) 707-1820 (FAX)

January 21, 2005
LL File No. 2005-01529

Dear Ms. Close:

In response to your request of January 6, 2005, we have enclosed a copy of the opinion written in 1990 by the Directorate of Legal Research in the Law Library of Congress that was cited by the Board of Immigration Appeals in the case of *Re Goorahoo*, 20 I. & N. 782 (B.I.A. 1994). This opinion interprets Guyana's Children Born Out of Wedlock (Removal of Discrimination) Act, 1983. 1983 Guy. Laws, No. 12.

It has been our pleasure to assist you, and we hope that this opinion will be helpful. The Law Library of Congress is the legal research arm of the U.S. Congress; Congressional workload permitting, the Law Library also serves the legal research needs of the other branches of the U.S. government and renders reference service to the general public. Should you need further assistance in this or any matter pertaining to international, comparative, or foreign law, please contact the Director of Legal Research, Walter Gary Sharp, Sr., by e-mail at wsharp@loc.gov or by fax at (202) 707-1820.

Sincerely,

*for* Stephen F. Clarke
Senior Legal Specialist

Enclosure

Barbara Close
Librarian
U.S. Courts Library

By fax: 860-240-3329

## LAW LIBRARY OF CONGRESS

## LEGITIMATION IN GUYANA

### Introduction

In 1916, the legislature of the Colony of British Guyana passed what is now referred to as the Civil Law of Guyana Act.[1] The purpose of this statute was to abrogate virtually all of the prevailing Roman–Dutch law and replace it with English common law. To avoid causing unnecessary confusion, the original Civil Law ordinance listed a number of specific fields that were to be expressly governed by the new legal regime once it came into force on January 1, 1917. Included among these listed fields was the law of "parent and child."[2] Thus, the rules of English com-

1. Civil Law of Guyana Act, Guy. Rev. Laws, ch. 6:01 (1977).

2. *Id.* 3.

mon law respecting the status of children were extended to Guyana just over seventy years ago.

## The Legitimacy Act

At English common law, a child born to unmarried parents is illegitimate and cannot be legitimated through any subsequent actions of his or her parents.[3] In 1926, the Parliament of the United Kingdom amended this common law rule by creating the Legitimacy Act.[4] Section 8 of this statute provided that a child born to unmarried parents was legitimated by their subsequent marriage as long as neither of his or her parents was married to a third party at the time he or she was born.[5]

In 1932, the legislature of British Guiana adopted its own Legitimacy Ordinance.[6] Like its British model, this statute provided that a child born to unmarried parents was legitimated by their subsequent marriage. The only difference between these two enactments was that unlike the British enactment, the colonial law did not contain an exception for child born out of an adulterous relationship.

## The Constitution of Guyana

Guyana became an independent country in 1966.[7] Fourteen years later, the Government replaced its original Constitution with a new document intended to promote certain socialistic objectives.[8] Section 30 of the Constitution of the Co-operative Republic of Guyana, 1980, provides as follows: "Children born out of wedlock are entitled to the same legal rights and legal status as are enjoyed by children born in wedlock. All forms of discrimination against children on the basis of their being born out of wedlock are illegal.[9]"

This section is contained is a chapter entitled the "Principles and bases of the political. economic, and social system." [10] Immediately preceding this chapter is another section that states: "[The] Constitution is the supreme law of Guyana and, if any other law is inconsistent with it, that other law shall, to the extent of the inconsistency, be void." [11]

Taken alone, the two paragraphs quoted above would appear to have abolished the legal distinction between legitimate and illegitimate children in Guyana and to have directed the courts to strike down any law that might discriminate against children born out of wedlock. However, the chapter of the 1980 Constitution that is devoted to establishing the "Principles and bases of the political, economic, and social system" concludes with a section that reads: "It is the duty of Parliament, the Government, the courts and all other public agencies to be guided in the discharge of their functions by the principles set out in this Chapter, and Parliament may provide for any of those principles to be enforceable in any court or tribunal." [12]

This provision suggests that instead of being included in the Constitution for the purpose of binding the National Assembly

---

3. Adoption is not recognized at common law but is authorized by statutes enacted in all common law jurisdictions.

4. Ch. 60, 16 & 18 Geo. 5.

5. *Id.* 8.

6. Guy. Rev. Laws, ch. 46:02 (1976).

7. Constitution of Guyana, Guy. Rev. Laws, ch. 1:01 (1977).

8. Constitution of the Co-operative Republic of Guyana Act, 1980. Guy. Laws. ch. 2.

9. *Id.* 30.

10. *Id.* Ch. 2.

11. *Id.* 8.

12. *Id.* 39.

and the courts, the "Principles and bases of the political. economic, and social system" were only intended to serve as goals that the National Assembly was obliged to try to help Guyana reach through the enactment of appropriate legislation. Therefore, in the absence of any judicial considerations of section 30 of the Constitution has not been construed in any reported decisions issued by the courts of Guyana, it is not clear whether the status of children born to unmarried parents was not legally affected by the developments of 1980.

## The Children Born Out of Wedlock (Removal of Discrimination) Act, 1983

In recent years, a number of common law jurisdictions in the Caribbean region have passed statutes modeled after New Zealand's Status of Children Act, 1969.[13] These enactments all purport to abolish the legal distinction between legitimate and illegitimate children for all purposes other than for determining citizenship and domicile, establishing transitional rules, and the construction of certain terms used in testamentary documents.[14]

Unlike many of its former sister colonies, Guyana has not enacted a Status of Children Act. However, in 1983, the National Assembly did adopt a Children Born Out of Wedlock (Removal of Discrimination) Act.[15] While this statute does not establish a general rule that all children are to be regarded as being of equal status regardless of whether they have been born to married or unmarried parents, it did amend a number of extant enactments to

eliminate references to illegitimacy and to give all children equal rights under them.[16]

The question of whether Guyana's Children Born Out of Wedlock (Removal of Discrimination) Act should be regarded as being equivalent to a Status of Children Act is not one that can be answered with an unqualified response. On one hand, it can be said that children born to unmarried parents in Guyana seem to now enjoy all the legal rights enjoyed by children born to unmarried parents in such countries as Barbados, Jamaica, and Trinidad and Tobago even though Guyana still has a Legitimacy Act that only provides for the legitimation through the subsequent marriage of a child's natural parents. The reason for this is that while most Status of Children Acts have repealed the legitimation laws that were previously in force within their territories, not all of them have done so. For example, Jamaica's Status of Children Act did not repeal that country's Legitimation Act.[17] Nevertheless, in *Matter of Clahar*, the Board of Immigration Appeals held that the enactment of Jamaica's Status of Children Act had effectively legitimated all children born to unmarried parents in that country.[18]

Despite the fact that children born to unmarried parents in Guyana now seem to enjoy all the legal rights enjoyed by children born to unmarried parents in such countries as Barbados, Jamaica, and Trinidad and Tobago, there is one major difference between Guyana's Children Born Out of Wedlock (Removal of Discrimination) Act and its neighbors' Status of Children

**13.** 4 N.Z. Repr. Stat. 893 (1979).

**14.** *See*, for example, the Status of Children Act, 17 Jam. Rev. Laws, 3–4 (1980).

**15.** 1983 Guy. Law, ch. 12.

**16.** *Id.* § 1 and Sched.

**17.** 11 Jam. Rev. Laws (1980).

**18.** 18 I. & N. Dec. 1, 1981 WL 158807 (B.I.A. 1981). In this case, the Board reconsidered its decision in *Matter of Clahar*, 16 I. & N. Dec. 484, 1978 WL 36438 (B.I.A.) and modified it upon the urging of the Immigration and Naturalization Service.

Acts. Unlike the latter, the former does not purport to render illegal all forms of discrimination against persons born to unmarried parents that it does not sanction. Thus, if the National Assembly were to adopt a statute that denies children born out of wedlock a right enjoyed by children born in wedlock, it would not contravene the Children Born Out of Wedlock (Removal of Discrimination) Act. By contrast, such a statute would offend any of the Status of Children Acts unless it was declared to operate notwithstanding the provisions of those laws. In this respect, the Status of Children Acts do give children born out of wedlock greater legal protection.

## Conclusion

Prior to 1980, a child born in Guyana to unmarried parents was illegitimate at birth.[19] Despite two subsequent developments, it is not clear that this situation has changed under the laws of Guyana. This is because the 1980 constitutional provision that declares: "children born out of wedlock are entitled to the same legal rights and the same legal status as are enjoyed by children born in wedlock" does not appear to empower the courts to strike down any inconsistent laws and the 1983 Children Born Out of Wedlock (Removal of Discrimination) Act does not attempt to generally abolish the legal distinction between legitimate and illegitimate children. Nevertheless, in *Matter of Clahar*, the Board of Immigration Appeals ultimately decided to advance beyond a strict, narrow, or technical reading of Jamaica's similarly ambiguous legitimation laws and hold that all children born to unmarried parents should be regarded as having been effectively legitimated by that country's Status of Children Act. A strong case can be made that the Children Born Out of Wedlock (Removal of Discrimination) Act should be interpreted in the same manner. The available laws of Guyana do not suggest that the Children Born Out of Wedlock (Removal of Discrimination) Act was passed without the intention that it would fully accomplish its stated objective.

Prepared by Stephen P. Clarke

Senior Legal Specialist

February 1990

---

19. There are no provisions in the laws of Guyana for the legitimation of a child through recognition. Therefore, the fact that her putative father's name appears on the subject's birth certificate does not affect her status. The appearance of a putative father's name on the birth certificate of a child born to unmarried parents is, however, strong evidence of paternity.