# United States Court of Appeals
## For the First Circuit

No. 99-8018

MIGUEL NOEL FIERRO,

Petitioner,

v.

JANET RENO, ATTORNEY GENERAL,

Respondent.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

No. 00-1037

MIGUEL NOEL FIERRO,

Petitioner,

v.

JANET RENO, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Circuit Judge,

Bownes, <u>Senior Circuit Judge</u>,

and Stahl, <u>Circuit Judge</u>.

——————————

<u>Matthew S. Robinowitz</u> for petitioner.
<u>Brenda M. O'Malley</u>, Office of Immigration Litigation, Civil Division, Department of Justice, with whom <u>David W. Ogden</u>, Acting Assistant Attorney General, Civil Division, and <u>Terri J. Scadron</u>, Senior Litigation Counsel, Office of Immigration Litigation, were on consolidated brief for respondent.

——————————

JUNE 5, 2000

——————————

BOUDIN, Circuit Judge.  On this appeal, Miguel Noel Fierro seeks review of a final order of removal, and a denial of reconsideration, from the Board of Immigration Appeals ("the Board").  The removal order is based on a statutory provision providing for the removal from the United States of "[a]ny alien who is convicted of an aggravated felony at any time after admission."  8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. II 1996).  Fierro concedes that he has been convicted of such a crime but says that he is not an alien but rather a citizen of the United States.

The critical background facts are not in dispute.  Fierro was born in Cuba on October 25, 1962.  He and both of his parents were admitted to the United States as refugees in 1970.  On October 19, 1973, Fierro's parents were divorced pursuant to a decree from a Massachusetts probate court, and the decree awarded Fierro's mother custody of both Fierro and his sister.  On March 25, 1976, Fierro's immigration status was changed to that of lawful permanent resident.

On March 21, 1978, when Fierro was 15 years old, his father became a naturalized citizen.  Had Fierro then been in the "legal custody" of his father, he would automatically have become an American citizen under 8 U.S.C. § 1432(a) (1994), which in defined circumstances provides automatic citizenship

-3-

for alien children whose parents are naturalized. Pertinent language in the statute, reprinted in full in an appendix to this decision, grants such citizenship to a child born outside the United States upon "[t]he naturalization of the parent having legal custody of the child when there has been a legal separation of the parents," assuming that this occurs while the child is under age 18 and that the child is a lawful permanent resident. Id. The last two conditions are satisfied here, and the case thus turns on whether the first condition ("legal custody") can also be met.

On February 15, 1996, Fierro was convicted in Massachusetts of larceny and sentenced to a term of four years in prison. It is undisputed that this conviction makes him an aggravated felon subject to removal. 8 U.S.C. §§ 1101(a)(43)(G), 1227(a)(2)(A)(iii) (Supp. II 1996). Fierro's criminal record is fairly long and it includes drug offenses, breaking and entering with intent to commit a felony, assault and battery, larceny, uttering and forgery. However, it was the 1996 larceny conviction that triggered an INS proceeding to remove Fierro from the country.

In the removal proceeding, Fierro argued inter alia that he became a United States citizen when his father was naturalized in 1978. On January 5, 1998, the immigration judge

-4-

rejected Fierro's citizenship claim because his mother had been awarded legal custody of him in 1973 and had never become a naturalized citizen. The judge ordered Fierro removed to Cuba. Fierro then appealed to the Board and on appeal he submitted an amended custody judgment secured from the Massachusetts probate court dated May 18, 1998, four months after the immigration judge's removal order. Although Fierro was now 35 years old, this decree purported to award custody to Fierro's father "nunc pro tunc to September 1, 1977."

On March 29, 1999, the Board issued a decision holding that Fierro should be given an opportunity to pursue a different avenue to avoid removal but it dismissed Fierro's claim of citizenship, concluding that the state court's 1998 modification of the custody decree had no effect on Fierro's citizenship status. After correcting a factual error on reconsideration, the Board adhered to its ultimate conclusion. Fierro then abandoned his alternative avenue for seeking to avoid removal and sought review of the Board's rejection of his citizenship claim.

The procedural path by which Fierro arrived in this court is complicated, see Fierro v. INS, 81 F. Supp. 2d 167 (D. Mass. 1999); Fierro v. INS, 66 F. Supp.2d 229 (D. Mass. 1999), but the intricacies are of no importance on this appeal, which

the government concedes is properly before this court. This court's authority to review removal orders based on an alien's commission of an aggravated felony has recently been restricted, 8 U.S.C. § 1252(a)(2)(C) (Supp. II 1996), but this does not bar Fierro's claim on review that he is a citizen rather than an alien, 8 U.S.C. § 1252(b)(5); Maghsoudi v. INS, 181 F.3d 8, 13 n.12 (1st Cir. 1999); Hall v. INS, 167 F.3d 852, 855-56 (4th Cir. 1999).

It is common ground that Fierro was not subject to removal as an alien convicted of an aggravated felony if he is presently an American citizen. Whether Fierro is an American citizen turns, in this case, entirely on issues of law, including the meaning of the automatic citizenship statute in question, 8 U.S.C. § 1432(a) (1994), and the legal effect to be accorded to the nunc pro tunc ruling of the Massachusetts probate court. Accordingly, our review is de novo and there is no occasion to transfer the case to a district court to resolve factual disputes pursuant to 8 U.S.C. § 1252(b)(5)(B) (Supp. II 1996).

Citizenship for one not born in the United States may be acquired "only as provided by Acts of Congress." Miller v. Albright, 523 U.S. 420, 423 (1998). Here, Fierro's claim of citizenship requires that there have occurred, while he was

under 18 and a permanent resident, "the naturalization of the parent having legal custody of the child." 8 U.S.C. § 1432(a) (1994). What is meant by the phrase "having legal custody of the child" is, of course, a question of federal statutory interpretation. But the Immigration and Naturalization Act provides no definition nor does the legislative history illuminate the concept. See H.R. Rep. No. 82-1365 (1952), reprinted in 1952 U.S.C.C.A.N. 1653, 1740.

Legal relationships between parents and children are typically governed by state law, there being "no federal law of domestic relations." De Sylva v. Ballentine, 351 U.S. 570, 580 (1956); see also Ex parte Burrus, 136 U.S. 586, 593-94 (1890). Accordingly, subject to possible limitations, we think that the requirement of "legal custody" in section 1432 should be taken presumptively to mean legal custody under the law of the state in question. Although there is no decision directly on point, this view is consistent with the approach taken in other cases in which a federal statute depends upon relations that are primarily governed by state law. E.g., De Sylva, 351 U.S. at 580.

On the premise that state law presumptively governs such relationships, Fierro reasons that the matter is controlled by the state probate court judgment entered in May 1998. In

that judgment, the court purported to decree that "as of September 1, 1977 custody of the minor child [Fierro] . . . is to be awarded" to the father and that "said order granting custody [of Fierro to his father] . . . be entered nunc pro tunc to September 1, 1977." There is authority under Massachusetts law, as in other jurisdictions, that a "judgment entered nunc pro tunc is respected and enforced as if it had been entered at the proper time." 43 Flanagan, Massachusetts Practice § 406 (1993 & Supp. 1999).

Fierro's argument is not without a certain surface plausibility, but we do not accept it. It is, as will become apparent, quite doubtful whether the nunc pro tunc decree is correct even as a matter of Massachusetts law; but while the reasons for suspecting a possible infirmity are pertinent to our ultimate holding, we do not rely upon this ground. Rather, even assuming arguendo that the nunc pro tunc order accords with Massachusetts law, it reflects an approach to defining legal custody that is not consistent with section 1432.

It is useful to begin by explaining in somewhat more detail (there is not a lot of detail available) the origin and substance of the state decree-modification proceeding. In December 1997, after the removal proceedings against Fierro had begun but before the immigration judge rejected Fierro's claim

of citizenship, his parents filed a "complaint for modification" in the probate court which asserted that on or about September 1, 1977, Fierro had moved to Florida to live with his father. Accompanying affidavits from Fierro's parents indicated that Fierro had at that date moved to Florida to live with his father in order to enroll in a school in Miami, Florida, and that Fierro was thus living with his father when in early 1978 his father became an American citizen.

The complaint for modification expressed the joint request of the parents that the order be entered "nunc pro tunc to . . . September 1, 1977," explaining that "[t]his modification is necessary for Miguel Noel Fierro to derive citizenship through his father and avoid being deported to Cuba." There is no indication of what proceedings, if any, followed, but by order dated May 18, 1998, the probate court granted the judgment modifying the earlier divorce and custody decree in terms already described--awarding custody to the father and providing that the custody order be entered nunc pro tunc to September 1, 1977.

Whether this is a proper nunc pro tunc order under state law is open to question. Like many other concepts in the law wrongly assumed to have a fixed meaning, nunc pro tunc is a somewhat loose concept, like "jurisdiction" or "waiver," used

somewhat differently by different courts in different contexts. Literally meaning "now for then" (in Latin) see Black's Law Dictionary 1097 (7th ed. 1999), it is a phrase typically used by courts to specify that an order entered at a later date should be given effect retroactive to an earlier date--that is, that it should be treated for legal purposes as if entered on the earlier date. Id. The critical question here is not the intended effect of the phrase but in what circumstances a court may properly order that a new judgment be given effect nunc pro tunc.

The core notion, in Massachusetts as in many other jurisdictions, is that a nunc pro tunc order is appropriate primarily to correct the record at a later date to make the record reflect what the court or other body actually intended to do at an earlier date but did not sufficiently express or did not get around to doing through some error or inadvertence. Thus, a clerical mistake in a judgment might be corrected nunc pro tunc when discovered later or a franchise sought as of October 1 might be backdated to that date where the application was timely made.

These concepts are embodied in a widely cited Massachusetts case explaining the scope of a court's nunc pro tunc authority as follows:

-10-

> The function of a nunc pro tunc order in general is to put upon the record and to render efficacious some finding, direction or adjudication of the court made actually or inferentially at an earlier time, which by accident, mistake or oversight was not made [a] matter of record, or to validate some proceeding actually taken but by oversight or mistake not authorized, or to prevent a failure of justice resulting, directly or indirectly from delay in court proceedings subsequent to a time when a judgment, order or decree ought to and would have been entered, save that the cause was pending under advisement.

Perkins v. Perkins, 114 N.E. 713, 713-14 (Mass. 1917).  However, it is clear that there are limits on the court's authority to make retroactive revisions to prior orders.  In Perkins itself, the court said that "a defect in a judgment, order or decree which expressed exactly the intention of the court at the time when it was made cannot be remedied by a nunc pro tunc entry."  Id. at 714.[1]

Under the then-prevailing decree, Fierro on September 1, 1977, was--and was intended by the probate court to be--in the "legal custody" of his mother.  Fierro had moved in with his father and perhaps the probate court might, if requested at the time, have ordered a transfer of legal custody.  But nothing

---

[1]Many other jurisdictions have said much the same thing. E.g., Murry v. State Farm Mut. Auto. Ins. Co., 725 S.W.2d 571, 572 (Ark. 1987); Jones v. Jones, 442 P.2d 319, 322-23 (Okla. 1968); 46 Am. Jur. 2d, Judgments § 157 (1994).

prevented his mother from retaining legal custody while Fierro was living (apparently for about a year) with his father in Florida. There is no indication of error, inadvertence or any of the conventional preconditions under Massachusetts law for a revision of the original decree nunc pro tunc.

The Supreme Court has held that where federal law incorporates a state characterization, a state trial court's construction of state law is not binding on a federal court. See Commissioner v. Estate of Bosch, 387 U.S. 456, 457 (1967) (federal estate tax liability turning on character of property interest). Several circuit courts have applied the Bosch rule in the context of probate court nunc pro tunc orders, holding that these orders are controlling for purposes of federal tax liability only when the federal court determines that they are proper under state law. E.g., Estate of Goldstein v. Commissioner, 479 F.2d 813, 816-20 (10th Cir. 1973). Seemingly, we could choose to disregard the probate court's modification order here as a misapplication of Massachusetts law.

Instead, we are more comfortable leaving the state law issue undecided and resting instead on a strictly federal ground. We do not think that Congress can be taken as intending to give effect, for purposes of section 1432, to the kind of ex post modification of a custody decree reflected in this record--

even if we assume that for purposes of Massachusetts law (e.g., inheritance, taxation), the probate court's modification decree could properly reclassify Fierro's status nunc pro tunc as of September 1977. This is so for two different reasons.

First, both the language of the automatic citizenship provision and its apparent underlying rationale suggest that Congress was concerned with the legal custody status of the child at the time that the parent was naturalized and during the minority of the child. See 8 U.S.C. § 1432(a)(4)-(5) (1994). Congress clearly intended that the child's citizenship should follow that of the parent who then had legal custody and it is rather easy to imagine the reasons for this choice: presumably Congress wanted the child to be protected against separation from the parent having legal custody during the child's minority.

Here, viewing matters at the time that Fierro's father became naturalized (and indeed through the time that Fierro turned 18), Fierro was under Massachusetts law in the legal custody of his mother, and any Massachusetts court asked in 1978 would certainly have identified his mother as the legal custodian under the 1973 decree. It is thus hard to see how it could be said that in 1978 there occurred the "naturalization of the parent having legal custody of the child," as section 1432

-13-

requires. Similarly, the apparent rationale of the statute would hardly be served by conferring citizenship on Fierro for the first time at age 35.

Second, recognizing the nunc pro tunc order in the present case would in substance allow the state court to create loopholes in the immigration laws on grounds of perceived equity or fairness. There is no suggestion that the original custody decree was entered by mistake, was contrary to law, or otherwise did not reflect the true legal relationship between Fierro and his parents at any time during his minority. Congress' rules for naturalization must be applied as they are written, and a state court has no more power to modify them on equitable grounds than does a federal court or agency. See generally INS v. Pangilinan, 486 U.S. 875, 883-85 (1988); Examining Bd. of Engineers, Architects & Surveyors v. de Otero, 426 U.S. 572, 605 (1976).

Obviously there are equitable arguments against separating Fierro even as an adult from his parents, one of whom is a naturalized citizen and the other a permanent resident. But Congress did not view these as compelling enough to provide for automatic citizenship for a "child" who is over 18 at the time one or more of his parents becomes naturalized. And Congress' fierce intention to deport aggravated felons, despite

their entry into this country as children and their long-standing residence in the United States, has only been strengthened by recent legislation. E.g., Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C., tit. III, 110 Stat. 3009-575.

The closest precedent on point is Miller v. Christopher, 96 F.3d 1467 (D.C. Cir. 1996), aff'd sub nom. Miller v. Albright, 523 U.S. 420 (1998). There, an alien born out of wedlock sought to gain citizenship through his father under an immigration-law provision providing for citizenship if the child was legitimated prior to reaching age 21. The D.C. Circuit rejected an effort to achieve this result through a state-court paternity decree obtained after the alien had reached age 21, holding that to give retroactive effect to the state court decree would undercut Congress' intent. Id. at 1472-73. The approach of Miller is not dissimilar to our own.

Conversely, we think Fierro gets little help from a Board doctrine, which he urges us to follow, that "[i]n the absence of judicial determination or judicial or statutory grant of custody in the case of legal separation . . . the parent having actual uncontested custody is to be regarded as having 'legal custody.'" In re M-----, 3 I & N Dec. 850, 856 (BIA 1950); see also In re Yoon, A-39-764-548 (BIA, Dec. 30, 1999)

-15-

(same). In our case there <u>was</u> a judicial decree granting custody to, and only to, Fierro's mother. Neither the letter nor the policy of the default rule expressed in <u>In re M-----</u> has any application to the present case.

However, <u>In re M-----</u> does illustrate how careful one must be about categorical pronouncements in this area. There are too many possible variations to say in the abstract, as the government urges, that a later state court decree must always be disregarded in applying section 1432. Suppose the original 1973 decree in Fierro's case had through a clerical error named his mother as legal custodian when the judge had ruled orally, and the parties had understood at the time, that custody had been awarded to his father. Our own decision is limited to the circumstances before us.

There is one loose end. In a pro se motion for bail/bond or in the alternative for supervised release, Fierro says that Cuba is not accepting deportees and that he is potentially subject to indefinite detention by the INS, which he claims would be unlawful. <u>Compare</u> <u>Ma</u> v. <u>Reno</u>, 208 F.3d 815 (9th Cir. 2000), <u>with</u> <u>Ho</u> v. <u>Greene</u>, 204 F.3d 1045 (10th Cir. 2000). At this point there is nothing in the record to indicate whether Cuba refuses all deportees or has refused or will refuse to accept Fierro, nor do we know whether in that event the INS

would release Fierro under some form of supervision.  <u>See</u> 8 U.S.C. § 1231(a)(3), -(6) (Supp. II 1996); 8 C.F.R. § 241.4, 241.5 (2000).  Our affirmance is without prejudice to any future assertion of such claims by Fierro if and when they become ripe.

The petitions for review of the order of removal and denial of reconsideration are <u>denied.</u>

8 U.S.C. § 1432 (1994) provides as follows:

   (a)   A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:

   (1)  The naturalization of both parents; or

   (2)  The naturalization of the surviving parent if one of the parents is deceased; or

   (3)  The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

   (4)  Such naturalization takes place while such child is under the age of eighteen years; and

   (5)  Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

   (b)   Subsection (a) of this section shall apply to an adopted child only if the child is residing in the United States at the time of naturalization of such adoptive parent or parents, in the custody of his adoptive parent or parents, pursuant to a lawful admission for permanent residence.