**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALFRED MINASYAN,

　　　　　　　　　　*Petitioner,*

　　　　　v.

ALBERTO R. GONZALES,* Attorney
General,

　　　　　　　　　　*Respondent.*

No. 02-73556

Agency No.
A29-617-744

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted December 7, 2004**
Pasadena, California

Filed March 22, 2005

Before: Stephen Reinhardt, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Reinhardt

---

　*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

　**This panel unanimously finds this case suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

3465

**COUNSEL**

Houman Varzandeh, Zaman & Varzandeh, Los Angeles, California, for the petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division; Linda S. Wendtland, Assistant Director; and Elizabeth J. Stevens, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington D.C., for the respondent.

**OPINION**

REINHARDT, Circuit Judge:

Alfred Minasyan, a native of Armenia, petitions for review of a per curiam order of the Board of Immigration Appeals ("BIA"). The BIA affirmed the decision of the immigration judge ("IJ"), denying Minasyan's applications for withholding of removal and protection under the Convention Against Torture ("CAT"). The BIA also found that Minasyan had not demonstrated eligibility for derivative citizenship under a now defunct provision of the Immigration and Nationality Act ("INA"), § 321(a)(3), 8 U.S.C. § 1432(a)(3) (1999), *repealed by* Pub. L. 106-395, Title I, § 103(a), Oct. 30, 2000, 114 Stat.

1632.[1] We conclude that Minasyan is a derivative citizen of the United States pursuant to that provision, and is thus not subject to removal as a felon convicted of an aggravated offense.

## I.

Minasyan, now twenty-five years old, first entered the United States with his family when he was eight, as a refugee from Armenia. He obtained lawful permanent resident status when he was ten. In October 1993, when he was fourteen, Minasyan's parents separated and his mother assumed sole custody of him. In December 1994, his mother became a United States citizen through naturalization.[2]

Shortly after his eighteenth birthday, in October 1997, Minasyan was arrested on charges of first degree burglary and

---

[1]Under former INA § 321(a), 8 U.S.C. § 1432, a child born outside of the United States of alien parents automatically becomes a citizen of the United States upon fulfillment of the following conditions:

   (1)   The naturalization of both parents; or

   (2)   The naturalization of the surviving parent if one of the parents is deceased; or

   (3)   The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

   (4)   Such naturalization takes place while such child is unmarried and under the age of eighteen years; and

   (5)   Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

[2]Minasyan's father became a citizen through naturalization on June 10, 1999, after Minasyan had turned eighteen.

attempted first degree burglary. He pleaded guilty to both crimes and was sentenced to two years in state prison.[3] Because of this conviction, the Immigration and Naturalization Service ("INS")[4] initiated removal proceedings. During the proceedings, Minasyan raised a claim of derivative citizenship on the basis of his mother's naturalization. The Immigration Judge denied the claim on April 30, 1999, and on February 26, 2000, Minasyan was removed to Armenia.

On April 19, 1999, just before the IJ ordered Minasyan removed, Minasyan's mother filed an action for the dissolution of her marriage. In April of 2001, the Los Angeles Superior Court filed an order granting the dissolution, to be effective in October 2001. The stipulated judgment issued by the court declared that Minasyan's parents had separated on October 1, 1993, and that his mother maintained sole legal custody of him from that date on. No one contests the accuracy of the factual findings or legal determinations contained in the court order.

Minasyan reentered the United States on a visitor's visa around the end of January 2001. In May 2001, the INS issued a notice of intent to reinstate the prior removal order. In response, Minasyan again asserted his citizenship claim, while also contending that he would be persecuted or tortured if he were returned to Armenia. The INS Citizenship Unit reviewed his file and found that although Minasyan "may have been in the legal custody of his mother at the time of her naturalization, no evidence has been provided to show that his parents' marital separation had been recognized by a court of

---

[3]He did not use any weapons or other dangerous items during the commission of the burglary and, consequently, received the minimum sentence.

[4]The INS ceased to exist on March 1, 2003, when its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. However, we refer to the agency as the INS here because the proceedings in this case were initiated before the transfer.

law." The agency then scheduled a hearing before an IJ to adjudicate his persecution and torture claims.

Before the IJ, Minasyan renewed his claim to derivative citizenship. He relied not only on the 2001 dissolution decree entered by the Los Angeles Superior Court, but on a subsequent *nunc pro tunc* judgment of that court confirming that his parents were legally separated on October 1, 1993. On the basis of the dissolution decree and the *nunc pro tunc* order, the IJ concluded that "the respondent has made out a *prima facie* claim to derivative United States citizenship through his United States citizen mother." She directed Minasyan to file a N-600 form ("Application for Certificate of Citizenship") and ordered the INS to adjudicate that application. The IJ explained that "if the applicant is not an 'alien' the court lacks jurisdiction to proceed and conduct a withholding only hearing." On March 12, the District Director denied Minasyan's citizenship application and informed Minasyan of his right to appeal.[5]

The IJ proceeded with the hearing, but declined to consider Minasyan's claim to citizenship. She explained that because the Citizenship Unit had denied his application, "any judicial interference or decision would have to come from the federal courts and not from the Immigration Court because we do not have authority to declare the respondent a citizen of the United States." The IJ ruled against Minasyan on the merits of his withholding and CAT claims.[6]

---

[5]The District Director emphasized the issue of custody, explaining that "[t]he Service does not acknowledge *nunc pro tunc* nor any other type of retroactive agreements to establish legal, physical[ ] custody for the purpose of obtaining an Immigration benefit. To derive your mother's American citizenship, there must have been a court order prior to your eighteenth birthday awarding your care and custody to your mother." Notably, on appeal, the government concedes that, if Minasyan's parents were legally separated, then he was in the legal custody of his mother.

[6]At the hearing, Minasyan testified as follows: Upon arriving in Armenia, he was interrogated and beaten by six police officers because he was

On appeal, the BIA affirmed, concluding that Minasyan had not demonstrated "that he derived United States citizenship under former section 321(a)(3) of the Act."[7] It also upheld the IJ's decision that Minasyan was ineligible for withholding of removal and protection under CAT. Minasyan seeks review only of the determination that he is not a United States citizen.

## II.

We do not have jurisdiction to review a criminal alien's final order of removal. 8 U.S.C. § 1252(a)(2)(C). However, where, as here, a petitioner claims that he is a United States citizen and that he is therefore not subject to removal, we

---

of Iranian descent, and spoke accented Armenian. They hit him in the back of the head, made him strip to his underwear, and robbed him of all his money. Then, while he was dazed and nearly naked, an officer attacked him with a knife, slashing open his hand when he tried to protect himself. After his release, Minasyan, without money or a place to stay, drifted through Yerevan, the capital of Armenia, for several months, picking up odd jobs, using the public baths, and sleeping on park benches. One day, two of the police officers who interrogated him found him sleeping in a park; they handcuffed him, took him to an underground garage and beat him, fracturing his ribs and burning his hands with cigarettes. After he was released, he sought medical attention and then contacted his mother in the States in an attempt to return home. Upon inspection at the hearing, the IJ noted the marks on his hand but concluded that she could not identify them as cigarette burns.

The IJ found that the crime for which Minasyan was deported was "a particularly serious crime," making him ineligible for withholding of removal under either INA § 241(b)(3) or CAT. In the alternative, she found that even if his crime were not "particularly serious," he failed to establish a clear probability of persecution on account of a protected ground and that his experiences did not constitute torture. Although she indicated that she had some doubts about Minasyan's testimony, she did not make an adverse credibility determination, finding instead that "even if he is telling us the truth" he had not established eligibility for relief.

[7]Thus, although the BIA noted that the IJ did not have jurisdiction to reconsider the INS's denial of Minasyan's citizenship claim, it considered and decided the merits of his claim.

have jurisdiction to determine his nationality claim. 8 U.S.C. § 1252(b)(5)(A); *see also Barthelemy v. Ashcroft*, 329 F.3d 1062, 1064 (9th Cir. 2003).[8] We review the legal questions involved in Minasyan's claim de novo. *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 966 (9th Cir. 2003); *Hughes v. Ashcroft*, 255 F.3d 752, 755 (9th Cir. 2001). Because "the INA explicitly places the determination of nationality claims solely in the hands of the courts of appeals and (if there are questions of fact to resolve) the district courts," we are not required to give *Chevron* deference to the agency's interpretation of the citizenship laws. *Hughes*, 255 F.3d at 758 (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

Minasyan argues that he is a derivative citizen pursuant to § 321(a) of the INA because his parents were legally separated and he was in the sole custody of his mother and under the age of eighteen when she was naturalized. In response, the government contends that this court does not have jurisdiction to consider Minasyan's citizenship claim because he failed to exhaust all available administrative remedies; specifically, he failed to appeal the decision of the District Director to the Administrative Appeals Unit. In the alternative, the government argues that Minasyan is not a derivative citizen by virtue of his mother's naturalization because he has not established that his parents were legally separated before his eighteenth birthday. We reject both of these arguments and conclude that Minasyan meets the requirements of citizenship as set forth in former § 321(a).

1. *Exhaustion*

**[1]** For a court to review a final order of removal an alien

---

[8]Because there is no genuine issue of material fact pertaining to Minasyan's nationality claim, we do not transfer the case to the district court but rather maintain jurisdiction to decide the legal issue. *See* 8 U.S.C. § 1252(b)(5)(A) - (B); *see also Perdomo-Padilla*, 333 F.3d at 966.

must typically exhaust all administrative remedies available to the alien as of right. 8 U.S.C. § 1252(d)(1); *see Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004) (holding that § 1252 "generally bars us, for lack of subject-matter jurisdiction, from reaching the merits of a legal claim not presented in administrative proceedings below"). However, a claim to citizenship need not be exhausted. *Rivera v. Ashcroft*, 394 F.3d 1129 (9th Cir. 2005).[9] As we explained in *Rivera*:

> The executive may deport certain aliens but has no authority to deport citizens. An assertion of U.S. "citizenship is thus a denial of an essential jurisdiction fact" in a deportation proceeding. *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922); *see also Frank v. Rogers*, 253 F.2d 889, 890 (D.C. Cir. 1958) ("Until the claim of citizenship is resolved, the propriety of the entire proceeding is in doubt.").

*Id.* at 1136. As in *Rivera*, if the government's argument that exhaustion is required were correct, "it would be possible to unintentionally relinquish U.S. citizenship . . . . The Constitution does not permit American citizenship to be so easily shed." *Id.* Thus, "[t]he statutory administrative exhaustion requirement of § 1252(d)(1) does not apply" to "a person with a non-frivolous claim to U.S. citizenship" even if he has previously been (illegally) deported by the government. *Id.* at 1140. *See also Moussa v. INS*, 302 F.3d 823, 825 (8th Cir. 2002) (holding that the exhaustion requirement of § 1252(d)(1) applies "only to an 'alien' " "challenging a final order of removal" and not to " 'any person.' "). Because Minasyan's claim to citizenship is not patently frivolous, we have jurisdiction to review it, irrespective of whether he has exhausted his claim before the agency.

---

[9]In *Taniguchi v. Schultz*, 303 F.3d 950 (9th Cir. 2002), we declined to consider a patently frivolous claim to citizenship. *See Rivera*, 394 F.3d at 1138 (distinguishing *Taniguchi*).

## 2. *Derivative Citizenship*

**[2]** Citizenship for one not born in the United States may be acquired "only as provided by Acts of Congress." *Miller v. Albright*, 523 U.S. 420, 424 (1998). Since the enactment of the first naturalization statute in 1790, our immigration laws have conferred derivative citizenship on the children of a naturalized citizen, provided certain statutorily prescribed conditions are met. *See* Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, *Immigration Law and Procedure* § 98.03[1]-[2] (2004) (hereinafter *Immigration Law*); INS Interp. § 320.1(a)(1).[10] As with all forms of citizenship, derivative citizenship is determined under the law in effect at time the critical events giving rise to eligibility occurred. *See Immigration Law at* § 91.03(a) (citing *Montana v. Kennedy*, 366 U.S. 308 (1961)). Thus, we analyze Minasyan's citizenship claim under § 321(a), the provision in effect at the time his mother became a naturalized citizen.

**[3]** INA § 321(a), provides, in pertinent part, that:

> A child born outside of the United States of alien parents . . . becomes a citizen of the United States upon fulfillment of the following conditions:
>
> . . .
>
> (3)  The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents . . . ; and if
>
> (4)  Such naturalization takes place while such child is under the age of eighteen years; and

---

[10]Because citizenship is transmitted automatically upon the parent's naturalization, it does not depend on the filing of an application, an administrative decision, a court order, an oath of allegiance, or any other procedure. *Immigration Law* at § 98.03[5] (citing INS Interp. § 320.1(a)(1)).

(5)   Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of . . . the parent naturalized under clause (2) or (3) of this subsection, or there-after begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (repealed 2000).[11] Minasyan meets condition (4), as his mother was naturalized in 1994, when he was 15 years old. He also meets condition (5) because he began to reside in the United States in 1988, when he was eight. With respect to condition (3), the government concedes that, because Minasyan was in the *actual* custody of his mother when she was naturalized, the *legal* custody condition would be met if he could show that his parents were legally separated at that time.[12] The critical question, therefore, is whether, at the time of his mother's naturalization, "there ha[d] been a legal separation of the parents." INA § 321(a)(3).

[4] The meaning of the term "legal separation" as contained in former INA § 321(a)(3) is a question of federal statutory interpretation. *See Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004); *Wedderburn v. INS*, 215 F.3d 795, 799 (7th Cir. 2000). Yet, the INA does not define the term and the only

---

[11]The Child Citizenship Act of 2000 ("CCA"), P.L. 106-395, repealed INA § 321 and amended INA § 320, 8 U.S.C. § 1431. Under this new provision, a child becomes a citizen if a custodial parent naturalizes, even if there has been no legal separation between the parents. However, this court has held that "the CCA granted automatic citizenship only to those children who were under the age of 18, and who met the other criteria, on February 27, 2001." *Hughes*, 255 F.3d at 760. Neither party claims that the CCA applies to this case.

[12]In its brief, the government concedes that Minasyan's mother had actual custody over him and explains that, under agency policy, "[i]n the absence of a judicial determination or judicial statutory grant of custody where the parents are legally separated, the parent having actual uncontested custody is to be regarded as having 'legal custody' of the person concerned." *See also Matter of M*, 3 I. & N. Decl. 850 (BIA 1950).

case from our circuit to discuss it merely holds that a legal separation must be preceded by a legal marriage. *See Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003) (holding that a petitioner did not "enjoy derivative citizenship under the first clause of § 321(a)(3) because his natural parents never married and thus could not *legally* separate." (emphasis in original)); *see also Wedderburn*, 215 F.3d at 797, 799-800 (same).

The Supreme Court has long held that while the "scope of a federal right is, of course, a federal question, . . . that does not mean that its content is not to be determined by state, rather than federal law." *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956). Although uniformity is an important concern in federal statutory interpretation, *see, e.g.*, *Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir. 1994), where the term in question involves a legal relationship that is created by state or foreign law, the court must begin its analysis by looking to that law. *See De Sylva*, 351 U.S. at 580. "This is especially true where a statute deals with a familiar relationship." *Id.* (noting that there is no federal law of domestic relations).

**[5]** Here, we conclude that the term in question — "legal separation" — means a separation recognized by law; because there is no federal law of domestic relations, that necessarily means a separation recognized by state law. As the Supreme Court recently emphasized, " '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.' " *Elk Grove Unified Sch. Dist. v. Newdow*, 124 S.Ct. 2301, 2309 (2004) (alteration in original) (quoting *In re Burrus*, 136 U.S. 586, 593-594 (1890)). "So strong is our deference to state law in this area that we have recognized a 'domestic relations exception' that 'divests the federal courts of power to issue divorce, alimony, and child custody

decrees.' " *Id*. (quoting *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992)).**¹³**

**[6]** Thus, we must look to the law of California — the state with jurisdiction over Minasyan's parents' marriage — when deciding whether a legal separation occurred. *See Wedderburn*, 215 F.3d at 799 (" 'Legal custody' and 'legal separation of the parents,' as words in a federal statute, must take their meaning from federal law . . . [b]ut federal law may point to state (or foreign) law as a rule of decision, and this is how the INS has consistently understood these terms."); *Fierro v. Reno,* 217 F.3d 1, 4 (1st Cir. 2000) ("[S]ubject to possible limitation, we think that the requirement of 'legal custody' in section 1432 should be taken presumptively to mean legal custody under the law of the state in question.").

Our decision to look to state law is consistent with our practice in other areas of federal law generally, and immigration law specifically. For example, entitlement to federal social security benefits often hinges on marital status as defined by state law. *See Califano v. Jobst*, 434 U.S. 47, 52-53 n.8 (1977); *Purganan v. Schweiker*, 665 F.2d 269, 270-71 (9th Cir. 1982); *see also Gillett-Netting v. Barnhart*, 371 F.3d 593, 599 (9th Cir. 2004) (holding that whether children are legitimate for purposes of entitlement to insurance benefits is determined by state law). Similarly, in the immigration context, although the question whether a couple entered into a marriage merely to avoid the immigration laws is a federal question, *see* 8 U.S.C. § 1186a(d)(1)(A)(i)(III), the first inquiry in determining whether a citizen can petition for a visa

---

**¹³**This circuit has previously declined to incorporate state law into the INA when construing the term "family ties" in an unrelated provision of the INA. In that instance, however, the term was a broad, general one for which state law provided no express definition. *See Kahn*, 36 F.3d at 1415 (rejecting incorporation of state marriage law into definition of "family ties" to bar discretionary relief under INA § 212(c)). Here, by contrast "legally separated" is a status that *necessarily* derives from state or foreign law.

for his non-citizen spouse is whether the couple is legally married under state law. *See* 8 U.S.C. § 1186a(d)(1)(A)(i)(I). Thus, our approach accords with the INS's long standing policy of looking to state law to determine questions of family relations, specifically marriage and custody. *See* INS Interp. § 320.1(a)(6) (noting that state law governs the issue of custody); *Wedderburn*, 215 F.3d at 799 (explaining that "the INS determines the existence, validity, and dissolution of wedlock using the legal rules of the place where the marriage was performed (or dissolved)").[14]

We now turn to California law. The California Family Code provides for both "legal separation" and "dissolution of marriage." *See* Cal. Fam. Code §§ 2320-21, 2330, 2338 (2004). In addition, California case law recognizes that spouses are separated for legal purposes beginning on a court-defined "date of separation." Such a separation is a separation by virtue of law. *See In re Marriage of Norviel*, 102 Cal. App. 4th 1152 (2002); *In re Marriage of Marsden*, 130 Cal. App. 3d 426 (1982); *Makeig v. United Sec. Bank & Trust Co.*, 112 Cal.App. 138, 143-44 (1931). That form of legal separation occurs under California law when the spouses "have come to a parting of the ways with no present intention of resuming marital relations." *In re Marriage of Marsden*, 130 Cal. App. 3d at 434 (quoting *In re Marriage of Baragry*, 73 Cal. App. 3d 444, 448 (1977)).

---

[14]Although we look presumptively to state law to determine whether a legal separation has occurred, "[t]his does not mean that a State would be entitled to use the [term at issue] in a way entirely strange to those familiar with its ordinary usage." *De Sylva*, 351 U.S. at 581. For example, "some orders that the relevant state or nation might not characterize as creating a legal separation may nonetheless effect such a drastic change in the couple's marital existence that the couple may be considered legally separated for purposes of [§321(a)(3)]." *Brissett*, 363 F.3d at 134. Thus, in some circumstances, the rule of the state with jurisdiction over the marriage might not control. But, "to the extent that there are permissible variations in the ordinary concept . . . we deem state law controlling." *De Sylva*, 351 U.S. at 581.

**[7]** We must consider which of these three forms of separation under California law constitute a legal separation for purposes of § 321(a). First, although the INA uses the term "legal separation" and does not mention "divorce" or "dissolution," we think it clear that Congress did not intend to exclude orders of divorce or dissolution from coverage under the statute. Second, because the term "legal separation" cannot possibly be limited to orders expressly so titled, we conclude that it encompasses other forms of court-ordered recognition of the final breakup of a marriage. When the term "legal separation" was adopted by Congress as part of the derivative citizenship provision, first in 1940 and then again in 1952,[15] it clearly referred to a separation by virtue of law, rather than the narrower statutory procedure titled "legal separation." Indeed, the narrower "legal separation" provision that currently appears in the California Code did not exist at the time of the Congressional actions. Rather, California law provided for dissolution of marriage and annulment, *see, e.g.*, Cal. Civ. Code §§ 82-86, 90-92 (1939); Cal. Civ. Code §§ 82-84, 90-92 (1951), and it recognized spouses to be separated in a "legal sense" when they were "living separate and apart" and there had been a "final rupture of the marital relationship." *Makeig*, 112 Cal. App. at 143; *see also* Cal. Civ. Code §§ 99, 169, 198 (1939); Cal. Civ. Code §§ 99, 169, 198 (1951).[16] Ultimately, we conclude that in California a separation by virtue of law constitutes a legal separation for purposes of the INA. *See*

---

[15]Nationality Act of 1940, Pub. L. No. 76-853, ch. 876, § 314, 54 Stat. 1137, 1145-46 (1940) (codified at former 8 U.S.C. § 714); Immigration and Nationality Act, Pub. L. 82-414, Title III, ch.2 § 321, 66 Stat. 245 (1952) (codified at former 8 U.S.C. § 1431).

[16]We note that there have been significant changes to California's family law in the last fifty years, most notably the amendment of provisions that discriminated on the basis of gender. By contrast, the form of legal separation that occurs under California law when spouses "have come to a parting of the ways with no present intention of resuming marital relations,' " *Marsden*, 130 Cal. App. 3d at 434 (internal quotations omitted), has remained unchanged.

*Makeig*, 112 Cal. App. at 143 (classifying such separations as "separation in the legal sense").

[8] Central to our determination is the fact that in California a separation by virtue of law entails important legal consequences under state law. Specifically, it "dictates the character of property acquired thereafter." *Norviel*, 102 Cal. App. 4th at 1158. Also, "[a] spouse's 'earnings and accumulations . . . while living separate and apart from the other spouse' are separate property." *Id.* (citing Cal. Fam. Code § 771(a)) (alterations in original); *see also Marsden*, 130 Cal. App. 3d at 432-33; Cal. Fam. Code § 772.[17] Critically, these consequences flow from the date of the separation, not from the date of a court order. *See Norviel*, 102 Cal. App. 4th at 1158.

[9] In this case, the California Superior Court entered a formal order — the judgment of dissolution of marriage — that recognized that Minasyan's parents separated in October 1993.[18] *Cf. Brissett*, 363 F.3d at 136 (holding that there was no legal separation where there was "no evidence . . . that the orders at issue mandated or acknowledged separate existences"). Thus, although the dissolution was not final until October 2001, the order establishes that, for purposes of state law, the separation was effective well before Minasyan's mother's naturalization in 1994. It also makes clear that Minasyan's

---

[17]Notably, under the California Code the "earnings and accumulations of . . . the minor children living with, or in the custody of, the spouse," are also the separate property of the custodial spouse after the date of separation. Cal. Fam. Code § 771(a). " 'Property' includes real and personal property and any interest therein." Cal. Fam. Code § 113.

[18]The subsequent *nunc pro tunc* order reiterates the original judicial determination that Minasyan's parents separated, as a matter of law, in October 1993. It clarifies that the separation constituted a legal separation under California law. It does not, however, change in any way the parties' prior status. In their arguments, the parties both emphasize the *nunc pro tunc* order. However, we need not consider whether to give any effect to that order because the judgment entered during the divorce proceedings resolves the legal question definitively.

mother had sole custody over her son from that date on. Because the order establishes the date of the legal separation for purposes of California law, we conclude that it is sufficient to establish the date for purposes of Minasyan's derivative citizenship under § 321(a).[19]

Our recognition of Minasyan's citizenship status is consistent with several of the identified purposes of former INA § 321(a). In enacting this particular derivative citizenship provision, Congress sought to protect parental rights, to preserve the family unit, and to ensure that only those alien children whose "real interests" were located in the United States with their custodial parent, and not abroad, should be automatically naturalized. *See* S. Rep. No. 2150, at 4 (1940); 86 Cong. Rec. 11945-53 (1940); H.R. Rep. No. 82-1365 pt. B., at 1680 (1952); *Barthelemy*, 329 F.3d at 1066 (identifying the protection of parental rights as an important purpose of § 321(a)(3)); *Fierro*, 217 F.3d at 6; *Wedderburn*, 215 F.3d at 800.

In this case, there is no danger that one parent's desire that the child attain derivative citizenship would overcome the objections of another parent with comparable legal rights. *Cf. Barthelemy*, 329 F.3d at 1066. To the contrary, giving effect to the state order protects the parental rights of the parent empowered to make decisions on behalf of the child under state law: Under the California Family Code, Minasyan's

---

[19]We note that at least one circuit has concluded that a separation must be formally or judicially recognized for it to constitute a legal separation within the meaning of the INA. As the Second Circuit reasoned, "[a] contrary interpretation would render superfluous the provision's specification that the separation must be 'legal.' " *Brissett*, 363 F.3d at 134. We need not consider whether, in the absence of a judicial order, a complete and final break in a California marital relationship would constitute a legal separation within the meaning of § 321(a)(3), because a court order declaring that the requisite separation occurred exists in this case. We also note that, here, the order of dissolution served a primary function that is entirely separate from the establishment of the date of separation and that the provision determining that date carries important legal consequences apart from any questions of immigration law. *See infra* note 20.

mother, as the parent with sole legal custody had the sole "right and the responsibility to make the decisions relating to the health, education, and welfare of a child." Cal. Fam. Code § 3006; *see also* Cal. Fam. Code § 3007; *Newdow*, 124 S.Ct. at 2311-12 (explaining the limited rights of the non-custodial parent under California law).[20]

## III.

[10] In sum, Minasyan meets the statutory requirements of § 321(a), because his parents were legally separated when his custodial parent naturalized. He may not be a model citizen, but "citizenship is not a license that expires upon misbehavior." *Rivera,* 394 F.3d at 1140 (quoting *Trop v. Dulles*, 356 U.S. 86, 92 (1958) (plurality opinion)). We grant the petition and order that Minasyan be released from detention forthwith upon the issuance of the mandate.

[20]This case is unlike those in which petitioners have sought to change relationships retroactively. *See Fierro v. Reno*, 217 F.3d 1, 6 (1st Cir. 2000) (holding that a state *nunc pro tunc* order, which retroactively changed custody from the petitioner's non-citizen mother to his citizen father, did not establish that he met all the criteria of INA § 321 because during the relevant time period he was *actually* in the custody of his mother); *Hendrix v. INS*, 583 F.2d 1102, 1103 (9th Cir. 1978) (holding that a woman admitted to the United States based on her representation that she was unmarried could not retroactively cure the fact that she was married at the time of entry by obtaining a subsequent annulment). As the court explained in *Fierro*, "Congress was concerned with the legal custody status of the child *at the time* that the parent was naturalized and during the minority of the child." 217 F.3d at 6 (emphasis in original). Retroactively changing the legal relationship would create a legal fiction and would not serve the purpose of the statute. *Id.* By contrast, the divorce decree declaring that Minasyan's parents were separated in October 1993 (as well as the subsequent *nunc pro tunc* order reiterating the original ruling) did not create a legal fiction, but rather acknowledged a separation that was actually in effect both in practice and as a matter of California law at the time Minasyan's mother was naturalized and while Minasyan was under age eighteen.

**PETITION GRANTED.**