**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH HAARON ROMERO-MENDOZA,
AKA Joe Romero, AKA Joseph
Romero, AKA Joseph A. Romero,
          *Petitioner,*

          v.

ERIC H. HOLDER JR., Attorney
General,
          *Respondent.*

No. 08-74674

Agency No.
A044-284-374

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
August 30, 2011—San Francisco, California

Filed December 19, 2011

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Robert J. Timlin,
Senior District Judge.*

Opinion by Judge Rawlinson

---

*The Honorable Robert J. Timlin, Senior District Judge for the United
States District Court, Central District of California, sitting by designation.

21043

**COUNSEL**

Cecil A. Lynn III, Ryley, Carlock & Applewhite, Phoenix, Arizona, for petitioner Joseph Haaron Romero-Mendoza.

Claire L. Workman (argued), Luis E. Perez, Office of Immigration Litigation, Tony West, Assistant Attorney General, Civil Division, Washington D.C., for respondent Eric Holder Jr., Attorney General of the United States.

**OPINION**

RAWLINSON, Circuit Judge:

Joseph Haaron Romero-Mendoza (Romero) petitions this court for review of the decision of the Board of Immigration Appeals (BIA) dismissing his appeal. The BIA found that Romero was removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) because he had committed a crime of violence and failed to establish entitlement to relief from removability. Romero contends that he obtained derivative citizenship from his mother's naturalization in this country, in accordance with 8 U.S.C. § 1432. The sole issue on appeal is whether Romero's paternity was legitimated under Salvadoran law, which would defeat his claim of derivative citizenship.

We have jurisdiction pursuant to 8 U.S.C. § 1252, and we affirm the BIA's decision.

## I.  *Background*

Romero entered the United States through Houston, Texas in October, 1993, and was subsequently admitted as a lawful permanent resident (LPR). He was born in El Salvador, out of wedlock, in August, 1979. His birth certificate lists the names of both parents: Oscar Armando Romero-Rivera (Romero-Rivera), father, and Nora Julia Mendoza-Galdamez (Mendoza), mother. Romero's mother was naturalized in Los Angeles on February 14, 1997, when Romero was seventeen. As of August, 22, 1996, Romero's mother was married to his father and Mendoza's naturalization certificate reflected her married status.

Romero was served with a notice of removability in January, 2008, for conviction of a drug offense, and for conviction of a crime of violence. Romero conceded that he was not a United States citizen, that he was born in El Salvador and that

he was a LPR, but denied the two charges of removal. At a subsequent hearing, the Immigration Judge (IJ) found that the Government's charges of removal had been established by clear and convincing evidence and that Romero was subject to removal. Nevertheless, Romero argued that he had obtained derivative citizenship through his mother's 1997 naturalization, thereby precluding his removal.

The IJ found that Romero had been legitimated under Salvadoran law by the inclusion of his father's name on his birth certificate and, therefore, had not derived citizenship from his mother. As a result, the IJ found Romero removable to El Salvador due to his conviction of a crime of violence.

The BIA affirmed the IJ's decision, holding that because Romero failed to adequately refute his legitimation by operation of Salvadoran law, he had failed to "rebut the presumption of alienage that arises by virtue of his foreign birth . . ." Thus, Romero was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because he had committed a crime of violence and failed to establish entitlement to relief from removability.

## II.  *Standard of Review*

We review questions of law in immigration proceedings *de novo. See Singh v. Holder*, 638 F.3d 1196, 1202-03 (9th Cir. 2011). "Questions of law include not only pure issues of statutory interpretation, but also application of law to undisputed facts, sometimes referred to as mixed questions of law and fact. . . ." *Retuta v. Holder*, 591 F.3d 1181, 1184 (9th Cir. 2010) (citation and internal quotation marks omitted). We are not required to give *Chevron* deference to the BIA's interpretation of citizenship laws. *See Minasyan v. Gonzales*, 401 F.3d 1069, 1074 (9th Cir. 2005).

"When the BIA conducts an independent review of the IJ's findings we review the BIA's findings and not those of the IJ.

To the extent that the BIA incorporates the IJ's decision as its own, we review the IJ's decision." *Gallegos-Vasquez v. Holder*, 636 F.3d 1181, 1184 (9th Cir. 2011) (citations omitted). The court reviews the BIA's factual findings for substantial evidence. *See Lopez-Birrueta v. Holder*, 633 F.3d 1211, 1214 (9th Cir. 2011).

## III. *Discussion*

Romero contends that his father's paternity was not established by legitimation and that the 1983 Salvadoran constitutional provision, which eliminated any distinctions between legitimate and illegitimate children, made legitimation under Salvadoran law a legal impossibility.

**[1]** "[D]erivative citizenship is determined under the law in effect at time the critical events giving rise to the eligibility occurred." *Minasyan*, 401 F.3d at 1075 (citation omitted) (analyzing derivative citizenship claim under the version of the provision as it existed when the petitioner's mother was naturalized). Thus, we look to the version of 8 U.S.C. § 1432 as it existed when Romero's mother was naturalized. In 1997, the relevant provisions of § 1432 provided:

> (a) A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
>
> * * *
>
> (3) The naturalization of the . . . mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if
>
> (4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the . . . parent naturalized under clause . . . (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432 (1997) (repealed 2000).

Legitimation may be established under either the law of the child's residence or the father's residence. *See* 8 U.S.C. § 1101(c)(1). Here, legitimation may be established under the law of El Salvador, where Romero's father resides, or California, where Romero resides.

**[2]** Although Romero was born out of wedlock, his parents' subsequent marriage prior to his mother's naturalization established Romero's paternity by legitimation. In *Ayala-Villanueva v. Holder*, 572 F.3d 736 (9th Cir. 2009), we considered a Salvadoran petitioner's claim of derivative citizenship. The petitioner was born out of wedlock, but his mother married his putative father prior to the mother's naturalization. *See id.* at 738-39. We observed that the marriage of petitioner's parents legitimated petitioner and precluded a claim of derivative citizenship. *See id.* at 739. Although *Ayala-Villanueva* did not specify which jurisdiction's law it applied, it can be easily inferred that the case applied Salvadoran law because it did not mention any state's law of legitimation. *See Ayala-Villanueva*, 572 F.3d at 738-39. In any event, Romero has made no effort to distinguish *Ayala-Villanueva*.

Despite our holding in *Ayala-Villanueva*, Romero asserts that because he was not legitimated under Salvadoran law as it existed at the time of his birth, the change in the Salvadoran constitution did not change his legitimation status. Prior to 1983, Salvadoran law provided that a child was legitimated by the act of registering the child's birth with the office of the Civil Registry and his or her parents' subsequent marriage.

*See Matter of Ramirez,* 16 I. & N. Dec. 222, 224 (BIA 1977). However, in 1983, El Salvador amended its constitution to eliminate any distinctions between children born during a marriage and those born out of wedlock. *See In re Moraga*, 23 I. & N. Dec. 195, 198-99 (BIA 2001).

Although Romero conceded that his father's name appears on his birth certificate, he contended for the first time during oral argument that the mere presence of Romero-Rivera's name on his birth certificate does not establish that he agreed to civil registration of Romero's paternity. To support his position, Romero referenced the government's objection during the administrative hearing to the admission of Romero's birth certificate. He also argued that anyone could have included Romero-Rivera's name on Romero's birth certificate.

We recognize that the government did object to the admission of Romero's birth certificate during the administrative hearing. However, the objection was predicated on the lack of translation from Spanish to English and the lack of attestation by an American official. Both issues were resolved and Romero's birth certificate was admitted into evidence without further objection.

**[3]** In any event, the BIA has definitely ruled that the 1983 amendment to the Salvadoran constitution eliminating legitimacy distinctions served to legitimate any child born out of wedlock. *See Moraga*, 23 I. & N. Dec. at 198-99. Although we owe no deference to the BIA on matters of determining citizenship status, s*ee Minasyan*, 401 F.3d at 1074, and although *In re Moraga* was rendered in the context of a visa petition, *see Moraga*, 23 I. & N. Dec. at 196, it is nevertheless persuasive authority because it is an en banc BIA decision that applied the 1983 Salvadoran law.[1] Indeed, the BIA spe-

---

[1]There is no reasoned basis for analyzing the concept of legitimation differently when considering the issue of derivative citizenship rather than visa eligibility. *See Matter of Hines*, 24 I. & N. Dec. 544, 548 (BIA 2008); *see also Kaur v. Holder*, 561 F.3d 957, 961 (9th Cir. 2009) (emphasizing the importance of consistent application of the immigration laws).

cifically noted that the changes in Salvadoran law required a modification of *Ramirez*. *See id.* at 199 (modifying *Ramirez* to reflect the elimination of distinctions between children born to married parents and those born out of wedlock who were not yet 18 years old on December 16, 1983). Thus, the fact that Romero was born prior to the enactment of the 1983 constitutional amendment and his contention that his father did not necessarily consent to civil registration of his son's birth certificate do not negate Petitioner's legitimation under Salvadoran law.

**[4]** Romero posits that legitimation is a legal impossibility in countries that have eliminated legal distinctions between children born to married parents and those born out of wedlock. He relies on *Gosira v. Loy*, 357 F.Supp.2d 453, 460 n. 11 (D. Conn. 2005), *reconsidered on other grounds, Gosira v. Chertoff*, 364 F.Supp.2d 230 (D. Conn. 2005), and on *Matter of Rowe*, 23 I. & N. Dec. 962 (BIA 2006). *Gosira* and *Rowe* both involved a petitioner from Guyana and an analysis under Guyanese law. *See Gosira*, 257 F. Supp.2d at 455, 460; *Rowe*, 23 I. & N. Dec. at 962-63. However, Guyanese law is not analogous to Salvadoran law because it retained distinctions between children born to married parents and those born out of wedlock. *See Gosira*, 257 F.Supp.2d at 461-62.[2] Thus, the changes in Guyanese law did not legitimate children born out of wedlock. *See id.* at 464. *Rowe* agreed with *Gosira's* reasoning and held that "the conclusion that all children, whether or not legitimate, are to be accorded equal treatment for all purposes" is not supported by Guyanese law. *See* 23 I. & N. Dec. at 966-67. In contrast, the Board in *Moraga* "conclude[d] that there was a change in Salvadoran law in 1983 which served to place children born out of wedlock in the

---

[2]The distinction in Guyanese law between children born to married parents and children born out of wedlock is demonstrated by the existence of an explicit method of legitimation: "a child born out of wedlock could only be legitimated by the subsequent marriage of his parents. . . ." *Gosira*, 357 F. Supp.2d at 461-62 (citation omitted).

same legal position as children born in wedlock in all respects. . . ." *Moraga*, 23 I. & N. Dec. at 198 (citation and footnote reference omitted). When legal distinctions are eliminated between children born to married parents and those born out of wedlock, the children born out of wedlock are deemed to be legitimated as of the date the laws are changed. *See id.* at 199.

Romero contends that his interpretation of § 1432 serves the legislative purpose of the Immigration and Nationality Act, namely reuniting and keeping United States families intact. In the context of this argument, Romero cites *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1066 (9th Cir. 2003) for the proposition that "the conceivable purpose of this provision was to ensure that parental rights are not interfered with when one parent naturalizes." However, Romero mischaracterizes this passage in *Barthelemy*, which explains § 1432's intended protection of an *alien father*, not a naturalized mother. "If United States citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished. . . . Thus, § [1432] prevents the naturalizing parent from usurping the parental rights of the alien parent." *Barthelemy*, 329 F.3d at 1066 (citations omitted). One does not have to imagine a fantastic hypothetical to consider the utility of this purpose. Suppose, as happened in this case, that Romero-Rivera does not attain citizenship in this country but marries Romero's mother, which legitimates his relationship with his son. If Romero's parents subsequently divorce and Romero's interpretation of § 1432 is sustained, Romero-Rivera's parental rights would be severed as a matter of law due to Romero's deemed out-of-wedlock status. Contrary to Romero's assertion, the purpose of § 1432 is better served by the interpretation of the statute articulated in *Ayala-Villanueva*, which maintains the father's parental rights.

## IV. *Conclusion*

[5] The BIA committed no error when it dismissed Romero's appeal. Romero failed to establish a claim of deriv-

ative citizenship due to his legitimation under Salvadoran law. In the absence of derivative citizenship, Romero was subject to removal due to his commission of a crime of violence.

**PETITION DENIED.**